# SHALALA, SECRETARY OF HEALTH AND HUMAN SERVICES, ET AL. *v.* ILLINOIS COUNCIL ON LONG TERM CARE, INC.

No. 98–1109.   Argued November 8, 1999—Decided February 29, 2000

1

4

BREYER, J., delivered the opinion of the Court, in which REHN-QUIST, C. J., and O'CONNOR, SOUTER, and GINSBURG, JJ., joined. STEVENS, J., *post*, p. 30, and SCALIA, J., *post*, p. 31, filed dissenting opinions. THOMAS, J., filed a dissenting opinion, in which STEVENS and KENNEDY, JJ., joined, and in which SCALIA, J., joined except as to Part III, *post*, p. 32.

*Jeffrey A. Lamken* argued the cause for petitioners. With him on the briefs were *Solicitor General Waxman, Acting Assistant Attorney General Ogden, Deputy Solicitor General Kneedler, Barbara C. Biddle, Jeffrey Clair, Harriet S. Rabb,* and *Jeffrey Golland.*

*Kimball R. Anderson* argued the cause for respondent. With him on the brief were *Charles P. Sheets, Bruce R. Braun,* and *Brian E. Neuffer.**

JUSTICE BREYER delivered the opinion of the Court.

The question before us is one of jurisdiction. An association of nursing homes sued, *inter alios,* the Secretary of Health and Human Services (HHS) and another federal party (hereinafter Secretary) in Federal District Court claiming that certain Medicare-related regulations violated various statutes and the Constitution. The association invoked the court's federal-question jurisdiction, 28 U. S. C. § 1331. The District Court dismissed the suit on the ground that it lacked jurisdiction. It believed that a set of special statutory provisions creates a separate, virtually exclusive, system of administrative and judicial review for denials of Medicare claims; and it held that one of those provisions explicitly barred a § 1331 suit. See 42 U. S. C. § 1395ii (incorporating into the Medicare Act 42 U. S. C. § 405(h), which provides that "[n]o action . . . to recover on any claim" arising under the Medicare laws shall be "brought under section 1331 . . . of title 28"). The Court of Appeals, however, reversed.

We conclude that the statutory provision at issue, § 405(h), as incorporated by § 1395ii, bars federal-question jurisdiction here. The association or its members must proceed instead through the special review channel that the Medicare statutes create. See 42 U. S. C. §§ 1395cc(h), (b)(2)(A), 1395ii; §§ 405(b), (g), (h).

*Briefs of *amici curiae* urging affirmance were filed for the American Association of Homes and Services for the Aging by *Mark H. Gallant;* for the American Health Care Association et al. by *Thomas C. Fox* and *Harvey M. Tettlebaum;* for the American Hospital Association by *Charles G. Curtis, Jr.,* and *Edward J. Green;* and for the American Medical Association et al. by *Paul M. Smith, Robert M. Portman, Michael L. Ile, Leonard A. Nelson, Richard N. Peterson, Ann E. Allen, Stuart M. Gerson, Saul J. Morse,* and *Robert J. Kane.*

I

A

We begin by describing the regulations that the association's lawsuit attacks. Medicare Act Part A provides payment to nursing homes which provide care to Medicare beneficiaries after a stay in a hospital. To receive payment, a home must enter into a provider agreement with the Secretary of HHS, and it must comply with numerous statutory and regulatory requirements. State and federal agencies enforce those requirements through inspections. Inspectors report violations, called "deficiencies." And "deficiencies" lead to the imposition of sanctions or "remedies." See generally §§ 1395i–3, 1395cc.

The regulations at issue focus on the imposition of sanctions or remedies. They were promulgated in 1994, 59 Fed. Reg. 56116, pursuant to a 1987 law that tightened the substantive standards that Medicare (and Medicaid) imposed upon nursing homes and that significantly broadened the Secretary's authority to impose remedies upon violators. Omnibus Budget Reconciliation Act of 1987, §§ 4201–4218, 101 Stat. 1330–160 to 1330–221 (codified as amended at 42 U. S. C. § 1395i–3 (1994 ed. and Supp. III)).

The remedial regulations (and a related manual) in effect tell Medicare-administering agencies how to impose remedies after inspectors find that a nursing home has violated substantive standards. They divide a nursing home's deficiencies into three categories of seriousness depending upon a deficiency's severity, its prevalence at the home, its relation with other deficiencies, and the home's compliance history. Within each category they list a set of remedies that the agency may, or must, impose. Where, for example, deficiencies "immediately jeopardize the health or safety of . . . residents," the Secretary must terminate the home's provider agreement or appoint new, temporary management. Where deficiencies are less serious, the Secretary

may impose lesser remedies, such as civil penalties, transfer of residents, denial of some or all payment, state monitoring, and the like. Where a nursing home, though deficient in some respects, is in "[s]ubstantial compliance," *i. e.,* where its deficiencies do no more than create a "potential for [causing] minimal harm," the Secretary will impose no sanction or remedy at all. See generally 42 U. S. C. § 1395i–3(h); 42 CFR § 488.301 (1998); § 488.400 *et seq.;* App. 54, 66 (Manual). The statute and regulations also create various review procedures. 42 U. S. C. §§ 1395cc(b)(2)(A), (h); 42 CFR § 431.151 *et seq.* (1998); § 488.408(g); 42 CFR pt. 498 (1998).

The association's complaint filed in Federal District Court attacked the regulations as unlawful in four basic ways. In its view: (1) certain terms, *e. g.,* "substantial compliance" and "minimal harm," are unconstitutionally vague; (2) the regulations and manual, particularly as implemented, violate statutory requirements seeking enforcement consistency, 42 U. S. C. § 1395i–3(g)(2)(D), and exceed the legislative mandate of the Medicare Act; (3) the regulations create administrative procedures inconsistent with the Federal Constitution's Due Process Clause; and (4) the manual and other agency publications create legislative rules that were not promulgated consistent with the Administrative Procedure Act's demands for "notice and comment" and a statement of "basis and purpose," 5 U. S. C. § 553. See App. 18–19, 27–38, 43–49 (Amended Complaint).

### B

We next describe the two competing jurisdictional routes through which the association arguably might seek to mount its legal attack. The route it has followed, federal-question jurisdiction, is set forth in 28 U. S. C. § 1331, which simply states that "district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." The route that it did not follow, the special Medicare review route, is set forth in a complex

set of statutory provisions, which must be read together. See Appendix, *infra*. The Medicare Act says that a home

> "dissatisfied . . . with *a determination described in subsection (b)(2)* . . . shall be entitled to a hearing . . . to the same extent as is provided in [the Social Security Act, 42 U. S. C. § ]405(b) . . . and to judicial review of the Secretary's final decision after such hearing as is provided in section 405(g) . . . ." 42 U. S. C. § 1395cc(h)(1) (emphasis added).

The cross-referenced subsection (b)(2) gives the Secretary power to terminate an agreement where, for example, the Secretary

> "*has determined* that the provider fails to comply substantially with the provisions [of the Medicare Act] and regulations thereunder . . . ." § 1395cc(b)(2)(A) (emphasis added).

The cross-referenced § 405(b) describes the nature of the administrative hearing to which the Medicare Act entitles a home that is "dissatisfied" with the Secretary's "determination." The cross-referenced § 405(g) provides that a "dissatisfied" home may obtain judicial review in federal district court of "any final decision of the [Secretary] made after a hearing . . . ." Separate statutes provide for administrative and judicial review of civil monetary penalty assessments. § 1395i–3(h)(2)(B)(ii); §§ 1320a–7a(c)(2), (e).

A related Social Security Act provision, § 405(h), channels most, if not all, Medicare claims through this special review system. It says:

> "(h) Finality of [Secretary's] decision.
> "The findings and decision of the [Secretary] after a hearing shall be binding upon all individuals who were parties to such hearing. No findings of fact or decision of the [Secretary] shall be reviewed by any person, tribunal, or governmental agency except as herein pro-

vided. *No action against the United States, the [Secretary], or any officer or employee thereof shall be brought under section 1331 or 1346 [federal defendant jurisdiction] of title 28 to recover on any claim arising under this subchapter."* (Emphasis added.)

Section 1395ii makes § 405(h) applicable to the Medicare Act "to the same extent as" it applies to the Social Security Act.

## C

The case before us began when the Illinois Council on Long Term Care, Inc. (Council), an association of about 200 Illinois nursing homes participating in the Medicare (or Medicaid) program, filed the complaint we have described, *supra*, at 7, in Federal District Court. (Medicaid is not at issue in this Court.) The District Court, as we have said, dismissed the complaint for lack of federal-question jurisdiction. No. 96 C 2953 (ND Ill., Mar. 31, 1997), App. to Pet. for Cert. 13a, 15a. In doing so, the court relied upon § 405(h) as interpreted by this Court in *Weinberger* v. *Salfi*, 422 U. S. 749 (1975), and *Heckler* v. *Ringer*, 466 U. S. 602 (1984). App. to Pet. for Cert. 15a–19a.

The Court of Appeals reversed the dismissal. 143 F. 3d 1072 (CA7 1998). In its view, a later case, *Bowen* v. *Michigan Academy of Family Physicians*, 476 U. S. 667 (1986), had significantly modified this Court's earlier case law. Other Circuits have understood *Michigan Academy* differently. See *Michigan Assn. of Homes and Servs. for the Aging* v. *Shalala*, 127 F. 3d 496, 500–501 (CA6 1997); *American Academy of Dermatology* v. *HHS*, 118 F. 3d 1495, 1499–1501 (CA11 1997); *St. Francis Medical Center* v. *Shalala*, 32 F. 3d 805, 812–813 (CA3 1994), cert. denied, 514 U. S. 1016 (1995); *Farkas* v. *Blue Cross & Blue Shield*, 24 F. 3d 853, 855–860 (CA6 1994); *Abbey* v. *Sullivan*, 978 F. 2d 37, 41–44 (CA2 1992); *National Kidney Patients Assn.* v. *Sullivan*, 958 F. 2d 1127, 1130–1134 (CADC 1992), cert. denied,

506 U. S. 1049 (1993). We granted certiorari to resolve those differences.

## II

Section 405(h) purports to make exclusive the judicial review method set forth in § 405(g). Its second sentence says that "[n]o findings of fact or decision of the [Secretary] shall be reviewed by any person, tribunal, or governmental agency except as herein provided." § 405(h). Its third sentence, directly at issue here, says that "[n]o action against the United States, the [Secretary], or any officer or employee thereof shall be brought under section 1331 or 1346 of title 28 *to recover on any claim arising under this subchapter.*" (Emphasis added.)

The scope of the italicized language "to recover on any claim arising under" the Social Security (or, as incorporated through § 1395ii, the Medicare) Act is, if read alone, uncertain. Those words clearly apply in a typical Social Security or Medicare benefits case, where an individual seeks a monetary benefit from the agency (say, a disability payment, or payment for some medical procedure), the agency denies the benefit, and the individual challenges the lawfulness of that denial. The statute plainly bars § 1331 review in such a case, irrespective of whether the individual challenges the agency's denial on evidentiary, rule-related, statutory, constitutional, or other legal grounds. But does the statute's bar apply when one who *might* later seek money or some other benefit from (or contest the imposition of a penalty by) the agency challenges in advance (in a § 1331 action) the lawfulness of a policy, regulation, or statute that *might* later bar recovery of that benefit (or authorize the imposition of the penalty)? Suppose, as here, a group of such individuals, needing advance knowledge for planning purposes, together bring a § 1331 action challenging such a rule or regulation on general legal grounds. Is such an action one "to recover on any claim arising under" the Social Security or Medicare Acts? That, in effect, is the question before us.

## III

In answering the question, we temporarily put the case on which the Court of Appeals relied, *Michigan Academy, supra,* to the side. Were we not to take account of that case, § 405(h) as interpreted by the Court's earlier cases of *Weinberger* v. *Salfi, supra,* and *Heckler* v. *Ringer, supra,* would clearly bar this § 1331 lawsuit.

In *Salfi,* a mother and a daughter, filing on behalf of themselves and a class of individuals, brought a § 1331 action challenging the constitutionality of a statutory provision that, if valid, would deny them Social Security benefits. See 42 U. S. C. §§ 416(c)(5), (e)(2) (imposing a duration-of-relationship Social Security eligibility requirement for surviving wives and stepchildren of deceased wage earners). The mother and daughter had appeared before the agency but had not completed its processes. The class presumably included some who had, and some who had not, appeared before the agency; the complaint did not say. This Court held that § 405(h) barred § 1331 jurisdiction for all members of the class because "it is the Social Security Act which provides both the standing and the substantive basis for the presentation of th[e] constitutional contentions." *Salfi, supra,* at 760–761. The Court added that the bar applies "irrespective of whether resort to judicial processes is necessitated by discretionary decisions of the Secretary or by his nondiscretionary application of allegedly unconstitutional statutory restrictions." 422 U. S., at 762. It also pointed out that the bar did not "preclude constitutional challenges," but simply "require[d] that they be brought" under the same "jurisdictional grants" and "in conformity with the same standards" applicable "to nonconstitutional claims arising under the Act." *Ibid.*

We concede that the Court also pointed to certain special features of the case not present here. The plaintiff class had asked for relief that included a direction to the Secretary to pay Social Security benefits to those entitled to them but for

the challenged provision. See *id.*, at 761. And the Court thought this fact helped make clear that the action arose "under the Act whose benefits [were] sought." *Ibid.* But in a later case, *Ringer*, the Court reached a similar result despite the absence of any request for such relief. See 466 U. S., at 616, 623.

In *Ringer*, four individuals brought a § 1331 action challenging the lawfulness (under statutes and the Constitution) of the agency's determination not to provide Medicare Part A reimbursement to those who had undergone a particular medical operation. The Court held that § 405(h) barred § 1331 jurisdiction over the action, even though the challenge was in part to the agency's procedures, the relief requested amounted simply to a declaration of invalidity (not an order requiring payment), and one plaintiff had as yet no valid claim for reimbursement because he had not even undergone the operation and would likely never do so unless a court set aside as unlawful the challenged agency "no reimbursement" determination. See *id.*, at 614–616, 621–623. The Court reiterated that § 405(h) applies where "both the standing and the substantive basis for the presentation" of a claim is the Medicare Act, *id.*, at 615 (quoting *Salfi*, 422 U. S., at 760–761) (internal quotation marks omitted), adding that a "claim for future benefits" is a § 405(h) "claim," 466 U. S., at 621–622, and that "all aspects" of any such present or future claim must be "channeled" through the administrative process, *id.*, at 614. See also *Your Home Visiting Nurse Services, Inc.* v. *Shalala*, 525 U. S. 449, 456 (1999); *Califano* v. *Sanders*, 430 U. S. 99, 103–104, n. 3 (1977).

As so interpreted, the bar of § 405(h) reaches beyond ordinary administrative law principles of "ripeness" and "exhaustion of administrative remedies," see *Salfi*, *supra*, at 757—doctrines that in any event normally require channeling a legal challenge through the agency. See *Abbott Laboratories* v. *Gardner*, 387 U. S. 136, 148–149 (1967) (ripeness); *McKart* v. *United States*, 395 U. S. 185, 193–196 (1969) (ex-

haustion). Indeed, in this very case, the Seventh Circuit held that several of respondent's claims were not ripe and remanded for ripeness review of the remainder. 143 F. 3d, at 1077–1078. Doctrines of "ripeness" and "exhaustion" contain exceptions, however, which exceptions permit early review when, for example, the legal question is "fit" for resolution and delay means hardship, see *Abbott Laboratories, supra,* at 148–149, or when exhaustion would prove "futile," see *McCarthy* v. *Madigan,* 503 U. S. 140, 147–148 (1992); *McKart, supra,* at 197–201. (And sometimes Congress expressly authorizes preenforcement review, though not here. See, *e. g.,* 15 U. S. C. § 2618(a)(1)(A) (Toxic Substances Control Act).)

Insofar as § 405(h) prevents application of the "ripeness" and "exhaustion" exceptions, *i. e.,* insofar as it demands the "channeling" of virtually all legal attacks through the agency, it assures the agency greater opportunity to apply, interpret, or revise policies, regulations, or statutes without possibly premature interference by different individual courts applying "ripeness" and "exhaustion" exceptions case by case. But this assurance comes at a price, namely, occasional individual, delay-related hardship. In the context of a massive, complex health and safety program such as Medicare, embodied in hundreds of pages of statutes and thousands of pages of often interrelated regulations, any of which may become the subject of a legal challenge in any of several different courts, paying this price may seem justified. In any event, such was the judgment of Congress as understood in *Salfi* and *Ringer.* See *Ringer, supra,* at 627; *Salfi, supra,* at 762.

Despite the urging of the Council and supporting *amici,* we cannot distinguish *Salfi* and *Ringer* from the case before us. Those cases themselves foreclose distinctions based upon the "potential future" versus the "actual present" nature of the claim, the "general legal" versus the "fact-specific" nature of the challenge, the "collateral" versus

"noncollateral" nature of the issues, or the "declaratory" versus "injunctive" nature of the relief sought. Nor can we accept a distinction that limits the scope of § 405(h) to claims for monetary benefits. Claims for money, claims for other benefits, claims of program eligibility, and claims that contest a sanction or remedy may all similarly rest upon individual fact-related circumstances, may all similarly dispute agency policy determinations, or may all similarly involve the application, interpretation, or constitutionality of interrelated regulations or statutory provisions. There is no reason to distinguish among them in terms of the language or in terms of the purposes of § 405(h). Section 1395ii's blanket incorporation of that provision into the Medicare Act as a whole certainly contains no such distinction. Nor for similar reasons can we here limit those provisions to claims that involve "amounts."

The Council cites two other cases in support of its efforts to distinguish *Salfi* and *Ringer: McNary* v. *Haitian Refugee Center, Inc.*, 498 U. S. 479 (1991), and *Mathews* v. *Eldridge*, 424 U. S. 319 (1976). In *Haitian Refugee Center*, the Court held permissible a § 1331 challenge to "a group of decisions or a practice or procedure employed in making decisions" despite an immigration statute that barred § 1331 challenges to any Immigration and Naturalization Service "'determination respecting an application for adjustment of status'" under the Special Agricultural Workers' program. 498 U. S., at 491–498. *Haitian Refugee Center*'s outcome, however, turned on the different language of that different statute. Indeed, the Court suggested that statutory language similar to the language at issue here—any claim "arising under" the Medicare or Social Security Acts, § 405(h)— would have led it to a different legal conclusion. See *id.*, at 494 (using as an example a statute precluding review of "'all causes . . . arising under any of'" the immigration statutes).

In *Eldridge*, the Court held permissible a District Court lawsuit challenging the constitutionality of agency proce-

dures authorizing termination of Social Security disability payments without a pretermination hearing. See 424 U. S., at 326–332. *Eldridge,* however, is a case in which the Court found that the respondent *had followed* the special review procedures set forth in § 405(g), thereby *complying with,* rather than *disregarding,* the strictures of § 405(h). See *id.,* at 326–327 (holding jurisdiction available only under § 405(g)). The Court characterized the constitutional issue the respondent raised as "collateral" to his claim for benefits, but it did so as a basis for requiring the agency to excuse, where the agency would not do so on its own, see *Salfi,* 422 U. S., at 766–767, some (but not all) of the procedural steps set forth in § 405(g). 424 U. S., at 329–332 (identifying collateral nature of the claim and irreparable injury as reasons to excuse § 405(g)'s exhaustion requirements); see also *Bowen* v. *City of New York,* 476 U. S. 467, 483–485 (1986) (noting that *Eldridge* factors are not to be mechanically applied). The Court nonetheless held that § 405(g) contains the nonwaivable and nonexcusable requirement that an individual present a claim to the agency before raising it in court. See *Ringer, supra,* at 622; *Eldridge, supra,* at 329; *Salfi, supra,* at 763–764. The Council has not done so here, and thus cannot establish jurisdiction under § 405(g).

The upshot is that without *Michigan Academy* the Council cannot win. Its precedent-based argument must rest primarily upon that case.

## IV

The Court of Appeals held that *Michigan Academy* modified the Court's earlier holdings by limiting the scope of "[§]1395ii and therefore § 405(h)" to "amount determinations." 143 F. 3d, at 1075–1076. But we do not agree. *Michigan Academy* involved a § 1331 suit challenging the lawfulness of HHS regulations that governed procedures used to calculate benefits under Medicare Part B—which Part provides voluntary supplementary medical insurance, *e. g.,* for doctors' fees. See 476 U. S., at 674–675; *United*

*States* v. *Erika, Inc.*, 456 U. S. 201, 202–203 (1982). The Medicare statute, as it then existed, provided for only limited review of Part B decisions. It allowed the equivalent of §405(g) review for "eligibility" determinations. See 42 U. S. C. §1395ff(b)(1)(B) (1982 ed.). It required private insurance carriers (administering the Part B program) to provide a "fair hearing" for disputes about Part B "amount determinations." §1395u(b)(3)(C). But that was all.

*Michigan Academy* first discussed the statute's total silence about review of "challenges mounted against the *method* by which . . . amounts are to be determined." 476 U. S., at 675. It held that this silence meant that, although review was not available *under §405(g)*, the silence did not itself foreclose other forms of review, say, review in a court action brought under §1331. See *id.*, at 674–678. Cf. *Erika, supra,* at 208 (holding that the Medicare Part B statute's *explicit* reference to carrier hearings for amount disputes does foreclose *all* further agency or court review of "amount determinations").

The Court then asked whether §405(h) barred 28 U. S. C. §1331 review of challenges to methodology. Noting the Secretary's *Salfi/Ringer*-based argument that §405(h) barred §1331 review of *all* challenges arising under the Medicare Act and the respondents' counterargument that §405(h) barred challenges to "methods" only where §405(g) review was available, see *Michigan Academy*, 476 U. S., at 679, the Court wrote:

> "Whichever may be the better reading of *Salfi* and *Ringer*, we need not pass on the meaning of §405(h) in the abstract to resolve this case. Section 405(h) does not apply on its own terms to Part B of the Medicare program, but is instead incorporated *mutatis mutandis* by §1395ii. The legislative history of both the statute establishing the Medicare program and the 1972 amendments thereto provides specific evidence of Congress' intent to foreclose review only of 'amount determina-

tions'—*i. e.*, those [matters] . . . remitted finally and exclusively to adjudication by private insurance carriers in a 'fair hearing.' By the same token, matters which Congress did *not* delegate to private carriers, such as challenges to the validity of the Secretary's instructions and regulations, are cognizable in courts of law." *Id.*, at 680 (footnote omitted).

The Court's words do not limit the scope of § 405(h) itself to instances where a plaintiff, invoking § 1331, seeks review of an "amount determination." Rather, the Court said that it would "*not* pass on the meaning of § 405(h) in the abstract." *Ibid.* (emphasis added). Instead it focused upon the Medicare Act's cross-referencing provision, § 1395ii, which makes § 405(h) applicable "*to the same extent as*" it is "applicable" to the Social Security Act. (Emphasis added.) It interpreted that phrase as applying § 405(h) "*mutatis mutandis*," *i. e.*, "[a]ll necessary changes having been made." Black's Law Dictionary 1039 (7th ed. 1999). And it applied § 1395ii with one important change of detail—a change produced by *not* applying § 405(h) where its application to a particular category of cases, such as Medicare Part B "methodology" challenges, would not lead to a channeling of review through the agency, but would mean no review at all. The Court added that a "'serious constitutional question' . . . would arise if we construed § 1395ii to deny a judicial forum for constitutional claims arising under Part B." 476 U. S., at 681, n. 12 (quoting *Salfi*, 422 U. S., at 762 (citing *Johnson* v. *Robison*, 415 U. S. 361, 366–367 (1974))).

More than that: Were the Court of Appeals correct in believing that *Michigan Academy* limited the scope of § 405(h) itself to "amount determinations," that case would have significantly affected not only Medicare Part B cases but cases arising under the Social Security Act and Medicare Part A as well. It accordingly would have overturned or dramatically limited this Court's earlier precedents, such as *Salfi* and *Ringer*, which involved, respectively, those programs.

It would, moreover, have created a hardly justifiable distinction between "amount determinations" and many other similar HHS determinations, see *supra*, at 14. And we do not understand why Congress, as JUSTICE STEVENS believes, *post*, at 30–31 (dissenting opinion), would have wanted to compel Medicare patients, but not Medicare providers, to channel their claims through the agency. Cf. Brief for Respondent 7–8, 18–21, 30–31 (apparently conceding the point). This Court does not normally overturn, or so dramatically limit, earlier authority *sub silentio.* And we agree with those Circuits that have held the Court did not do so in this instance. See *Michigan Assn. of Homes and Servs.*, 127 F. 3d, at 500–501; *American Academy of Dermatology*, 118 F. 3d, at 1499–1501; *St. Francis Medical Center*, 32 F. 3d, at 812; *Farkas*, 24 F. 3d, at 855–861; *Abbey*, 978 F. 2d, at 41–44; *National Kidney Patients Assn.*, 958 F. 2d, at 1130–1134.

JUSTICE THOMAS maintains that *Michigan Academy* "must have established," by way of a new interpretation of § 1395ii, the critical distinction between a dispute about an agency determination in a particular case and a more general dispute about, for example, the agency's authority to promulgate a set of regulations, *i. e.*, the very distinction that this Court's earlier cases deny. *Post*, at 38 (dissenting opinion). He says that, in this respect, we have mistaken *Michigan Academy*'s "reasoning" (the presumption against preclusion of judicial review) for its "holding." *Post*, at 39–40. And, he finds the holding consistent with earlier cases such as *Ringer* because, he says, in *Ringer* everyone simply assumed without argument that § 1395ii's channeling provision fully incorporated the whole of § 405(h). *Post*, at 40–42.

For one thing, the language to which JUSTICE THOMAS points simply says that "Congres[s] inten[ded] to foreclose review only of 'amount determinations'" and not "matters which Congress did *not delegate to private carriers, such as* challenges to the validity of the Secretary's instructions and regulations," *Michigan Academy, supra*, at 680 (emphasis

added). That language refers to particular features of the Medicare Part B program—"private carriers" and "amount determinations"—which are not here before us. And its reference to "foreclosure" of review quite obviously cannot be taken to refer to § 1395ii because, as we have explained, § 1395ii is a channeling requirement, not a foreclosure provision—of "amount determinations" or anything else. In short, it is difficult to reconcile JUSTICE THOMAS' characterization of *Michigan Academy* as a holding that *§ 1395ii* is "trigger[ed]" only by "challenges to . . . particular determinations," *post*, at 40, with the *Michigan Academy* language to which he points.

Regardless, it is more plausible to read *Michigan Academy* as *holding* that § 1395ii does not apply § 405(h) where application of § 405(h) would not simply channel review through the agency, but would mean no review at all. And contrary to JUSTICE SCALIA's suggestion, *post*, at 31–32 (dissenting opinion), that single rule applies to Medicare Part A as much as to Medicare Part B. This latter holding, as we have said, has the virtues of consistency with *Michigan Academy*'s actual language; consistency with the holdings of earlier cases such as *Ringer*; and consistency with the distinction that this Court has often drawn between a total preclusion of review and postponement of review. See, *e. g.*, *Salfi, supra*, at 762 (distinguishing § 405(h)'s channeling requirement from the complete preclusion of judicial review at issue in *Robison, supra*, at 373); *Thunder Basin Coal Co. v. Reich*, 510 U. S. 200, 207, n. 8 (1994) (strong presumption against preclusion of review is not implicated by provision postponing review); *Haitian Refugee Center*, 498 U. S., at 496–499 (distinguishing between *Ringer* and *Michigan Academy* and finding the case governed by the latter because the statute precluded all meaningful judicial review). JUSTICE THOMAS refers to an "antichanneling" presumption (a "presumption in favor of preenforcement review," *post*, at 46–47). But any such presumption must be far weaker than a pre-

sumption against preclusion of all review in light of the traditional ripeness doctrine, which often requires initial presentation of a claim to an agency. As we have said, *supra,* at 13, Congress may well have concluded that a universal obligation to present a legal claim first to HHS, though postponing review in some cases, would produce speedier, as well as better, review overall. And this Court crossed the relevant bridge long ago when it held that Congress, in both the Social Security Act and the Medicare Act, insisted upon an initial presentation of the matter to the agency. *Ringer,* 466 U. S., at 627; *Salfi,* 422 U. S., at 762. *Michigan Academy* does not require that we reconsider that longstanding interpretation.

V

The Council argues that in any event it falls within the exception that *Michigan Academy* creates, for here as there, it can obtain no review at all unless it can obtain judicial review in a § 1331 action. In other words, the Council contends that application of § 1395ii's channeling provision to the portion of the Medicare statute and the Medicare regulations at issue in this case will amount to the "practical equivalent of a total denial of judicial review." *Haitian Refugee Center, supra,* at 497. The Council, however, has not convinced us that is so.

The Council says that the special review channel that the Medicare statutes create applies only where the Secretary *terminates* a home's provider agreement; it is not available in the more usual case involving imposition of a lesser remedy, say, the transfer of patients, the withholding of payments, or the imposition of a civil monetary penalty.

We have set forth the relevant provisions, *supra,* at 8–9; Appendix, *infra.* The specific judicial review provision, § 405(g), authorizes judicial review of "any final decision of the [Secretary] made after a [§ 405(b)] hearing." A further relevant provision, § 1395cc(h)(1), authorizes a § 405(b) hearing whenever a home is "dissatisfied . . . with a *determi-*

*nation described* in subsection (b)(2)." (Emphasis added.) And subsection (b)(2) authorizes the Secretary to terminate an agreement, whenever she *"has determined* that the provider fails to comply substantially with" statutes, agreements, or "regulations." § 1395cc(b)(2)(A) (emphasis added).

The Secretary states in her brief that the relevant "determination" that entitles a "dissatisfied" home to review is any determination that a provider has failed to comply substantially with the statute, agreements, or regulations, whether termination or *"some other remedy* is imposed." Reply Brief for Petitioners 14 (emphasis added). The Secretary's regulations make clear that she so interprets the statute. See 42 CFR §§ 498.3(b)(12), 498.1(a)–(b) (1998). The statute's language, though not free of ambiguity, bears that interpretation. And we are aware of no convincing countervailing argument. We conclude that the Secretary's interpretation is legally permissible. See *Chevron U. S. A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U. S. 837, 843 (1984); *Your Home Visiting Nurse Services,* 525 U. S., at 453; see also 42 U. S. C. § 1395i–3(h)(2)(B)(ii) (providing a different channel for administrative and judicial review of decisions imposing civil monetary penalties.)

The Council next argues that the regulations, as implemented by the enforcement agencies, deny review in practice by (1) insisting that a nursing home with deficiencies present a corrective plan, (2) imposing no further sanction or remedy if it does so, but (3) threatening termination if it does not. See 42 CFR §§ 488.402(d), 488.456(b)(ii) (1998). Because a home cannot risk termination, the Council adds, it must always submit a plan, thereby avoiding imposition of a remedy, but simultaneously losing its opportunity to contest the lawfulness of any remedy-related rules or regulations. See § 498.3(b)(12). And, the Council's *amici* assert, compliance actually harms the home by subjecting it to increased sanctions later on by virtue of the unreviewed deficiency findings,

and because the agency makes deficiency findings public on the Internet, § 488.325.

The short, conclusive answer to these contentions is that the Secretary denies any such practice. She states in her brief that a nursing home with deficiencies can test the lawfulness of her regulations simply by refusing to submit a plan and incurring a minor penalty. Minor penalties, she says, are the norm, for "terminations from the program are rare and generally reserved for the most egregious recidivist institutions." Reply Brief for Petitioners 18; *ibid.* (HHS reports that only 25 out of more than 13,000 nursing homes were terminated in 1995–1996). She adds that the "remedy imposed on a facility that fails to submit a plan of correction or to correct a deficiency—and appeals the deficiency—is no different than the remedy the Secretary ordinarily would impose in the first instance." *Ibid.* Nor do the regulations "cause providers to suffer more severe penalties in later enforcement actions based on findings that are unreviewable." *Ibid.* The Secretary concedes that a home's deficiencies are posted on the Internet, but she notes that a home can post a reply. See *id.*, at 20, n. 20.

The Council gives us no convincing reason to doubt the Secretary's description of the agency's general practice. We therefore need not decide whether a general agency practice that forced nursing homes to abandon legitimate challenges to agency regulations could amount to the "practical equivalent of a total denial of judicial review," *Haitian Refugee Center*, 498 U. S., at 497.. Contrary to what JUSTICE THOMAS says, *post*, at 42–43, 51–52, we do not hold that an individual party could circumvent § 1395ii's channeling requirement simply because that party shows that postponement would mean added inconvenience or cost in an isolated, particular case. Rather, the question is whether, as applied generally to those covered by a particular statutory provision, hardship likely found in many cases turns what ap-

pears to be simply a channeling requirement into *complete* preclusion of judicial review. See *Haitian Refugee Center, supra,* at 496–497. Of course, individual hardship may be mitigated in a different way, namely, through excusing a number of the steps in the agency process, though not the step of presentment of the matter to the agency. See *supra,* at 14–15; *infra,* at 24. But again, the Council has not shown anything other than potentially isolated instances of the inconveniences sometimes associated with the postponement of judicial review.

The Council complains that a host of procedural regulations unlawfully limit the extent to which the agency itself will provide the administrative review channel leading to judicial review, for example, regulations insulating from review decisions about a home's level of noncompliance or a determination to impose one, rather than another, penalty. See 42 CFR §§ 431.153(b), 488.408(g)(2), 498.3(d)(10)(ii) (1998). The Council's members remain free, however, after following the special review route that the statutes prescribe, to contest in court the lawfulness of any regulation or statute upon which an agency determination depends. The fact that the agency might not provide a hearing for that *particular contention,* or may lack the power to provide one, see *Sanders,* 430 U. S., at 109 ("Constitutional questions obviously are unsuited to resolution in administrative hearing procedures . . ."); *Salfi,* 422 U. S., at 764; Brief for Petitioners 45, is beside the point because it is the "action" arising under the Medicare Act that must be channeled through the agency. See *Salfi, supra,* at 762. After the action has been so channeled, the court will consider the contention when it later reviews the action. And a court reviewing an agency determination under § 405(g) has adequate authority to resolve any statutory or constitutional contention that the agency does not, or cannot, decide, see *Thunder Basin Coal,* 510

U. S., at 215, and n. 20; *Haitian Refugee Center, supra,* at 494; *Ringer,* 466 U. S., at 617; *Salfi, supra,* at 762, including, where necessary, the authority to develop an evidentiary record.

Proceeding through the agency in this way provides the agency the opportunity to reconsider its policies, interpretations, and regulations in light of those challenges.  Nor need it waste time, for the agency can waive many of the procedural steps set forth in § 405(g), see *Salfi, supra,* at 767, and a court can deem them waived in certain circumstances, see *Eldridge,* 424 U. S., at 330–331, even though the agency technically holds no "hearing" on the claim.  See *Salfi, supra,* at 763–767 (holding that Secretary's decision not to challenge the sufficiency of the appellees' exhaustion was in effect a determination that the agency had rendered a "final decision" within the meaning of § 405(g)); *Eldridge, supra,* at 331–332, and n. 11 (invoking practical conception of finality to conclude that collateral nature of claim and potential irreparable injury from delayed review satisfy the "final decision" requirement of § 405(g)).  At a minimum, however, the matter must be presented to the agency prior to review in a federal court.  This the Council has not done.

Finally, the Council argues that, because it is an association, not an individual, it cannot take advantage of the special review channel, for the statute authorizes review through that channel only at the request of a "dissatisfied" "institution or agency."  42 U. S. C. § 1395cc(h)(1).  The Council speaks only on behalf of its member institutions, and thus has standing only because of the injury those members allegedly suffer.  See *Arizonans for Official English* v. *Arizona,* 520 U. S. 43, 65–66 (1997); *Hunt* v. *Washington State Apple Advertising Comm'n,* 432 U. S. 333, 343 (1977).  It is essentially their rights to review that are at stake.  And the statutes that create the special review channel adequately protect those rights.

## VI

For these reasons, this case cannot fit within *Michigan Academy*'s exception. The bar of § 405(h) applies. The judgment of the Court of Appeals is

*Reversed.*

## APPENDIX TO OPINION OF THE COURT

42 U. S. C. § 1395cc(h)(1) provides:

"(h) Dissatisfaction with determination of Secretary; appeal by institutions or agencies; single notice and hearing

"(1) Except as provided in paragraph (2), an institution or agency dissatisfied with a determination by the Secretary that it is not a provider of services or with a determination described in subsection (b)(2) of this section shall be entitled to a hearing thereon by the Secretary (after reasonable notice) to the same extent as is provided in section 405(b) of this title, and to judicial review of the Secretary's final decision after such hearing as is provided in section 405(g) of this title, except that, in so applying such sections and in applying section 405(*l*) of this title thereto, any reference therein to the Commissioner of Social Security or the Social Security Administration shall be considered a reference to the Secretary or the Department of Health and Human Services, respectively."

42 U. S. C. § 1395cc(b) provides, in relevant part:

"(b) Termination or nonrenewal of agreements

.        .        .        .        .

"(2) The Secretary may refuse to enter into an agreement under this section or, upon such reasonable notice to the provider and the public as may be specified in regulations, may refuse to renew or may terminate such an agreement after the Secretary—

"(A) has determined that the provider fails to comply substantially with the provisions of the agreement, with the provisions of this subchapter and regulations thereunder, or with a corrective action required under section 1395ww(f)(2)(B) of this title."

42 U. S. C. § 405(b) provides, in relevant part:

"(b) Administrative determination of entitlement to benefits; findings of fact; hearings; investigations; evidentiary hearings in reconsiderations of disability benefit terminations; subsequent applications

"(1) The Commissioner of Social Security is directed to make findings of fact, and decisions as to the rights of any individual applying for a payment under this subchapter. Any such decision by the Commissioner of Social Security which involves a determination of disability and which is in whole or in part unfavorable to such individual shall contain a statement of the case, in understandable language, setting forth a discussion of the evidence, and stating the Commissioner's determination and the reason or reasons upon which it is based. Upon request by any such individual or upon request by a wife, divorced wife, widow, surviving divorced wife, surviving divorced mother, surviving divorced father, husband, divorced husband, widower, surviving divorced husband, child, or parent who makes a showing in writing that his or her rights may be prejudiced by any decision the Commissioner of Social Security has rendered, the Commissioner shall give such applicant and such other individual reasonable notice and opportunity for a hearing with respect to such decision, and, if a hearing is held, shall, on the basis of evidence adduced at the hearing, affirm, modify, or reverse the Commissioner's findings of fact and such decision. Any such request with respect to such a decision must be filed within sixty days after notice of

such decision is received by the individual making such request.  The Commissioner of Social Security is further authorized, on the Commissioner's own motion, to hold such hearings and to conduct such investigations and other proceedings as the Commissioner may deem necessary or proper for the administration of this subchapter.  In the course of any hearing, investigation, or other proceeding, the Commissioner may administer oaths and affirmations, examine witnesses, and receive evidence.  Evidence may be received at any hearing before the Commissioner of Social Security even though inadmissible under rules of evidence applicable to court procedure.

.          .          .          .          .

"(3)(A)  A failure to timely request review of an initial adverse determination with respect to an application for any benefit under this subchapter or an adverse determination on reconsideration of such an initial determination shall not serve as a basis for denial of a subsequent application for any benefit under this subchapter if the applicant demonstrates that the applicant, or any other individual referred to in paragraph (1), failed to so request such a review acting in good faith reliance upon incorrect, incomplete, or misleading information, relating to the consequences of reapplying for benefits in lieu of seeking review of an adverse determination, provided by any officer or employee of the Social Security Administration or any State agency acting under section 421 of this title.

"(B)  In any notice of an adverse determination with respect to which a review may be requested under paragraph (1), the Commissioner of Social Security shall describe in clear and specific language the effect on possible entitlement to benefits under this subchapter of choosing to reapply in lieu of requesting review of the determination."

42 U. S. C. § 405(g) provides:

"(g) Judicial review

"Any individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action commenced within sixty days after the mailing to him of notice of such decision or within such further time as the Commissioner of Social Security may allow. Such action shall be brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business, or, if he does not reside or have his principal place of business within any such judicial district, in the United States District Court for the District of Columbia. As part of the Commissioner's answer the Commissioner of Social Security shall file a certified copy of the transcript of the record including the evidence upon which the findings and decision complained of are based. The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing. The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive, and where a claim has been denied by the Commissioner of Social Security or a decision is rendered under subsection (b) of this section which is adverse to an individual who was a party to the hearing before the Commissioner of Social Security, because of failure of the claimant or such individual to submit proof in conformity with any regulation prescribed under subsection (a) of this section, the court shall review only the question of conformity with such regulations and the validity of such regulations. The court may, on motion of the Commissioner

of Social Security made for good cause shown before the Commissioner files the Commissioner's answer, remand the case to the Commissioner of Social Security for further action by the Commissioner of Social Security, and it may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding; and the Commissioner of Social Security shall, after the case is remanded, and after hearing such additional evidence if so ordered, modify or affirm the Commissioner's findings of fact or the Commissioner's decision, or both, and shall file with the court any such additional and modified findings of fact and decision, and a transcript of the additional record and testimony upon which the Commissioner's action in modifying or affirming was based. Such additional or modified findings of fact and decision shall be reviewable only to the extent provided for review of the original findings of fact and decision. The judgment of the court shall be final except that it shall be subject to review in the same manner as a judgment in other civil actions. Any action instituted in accordance with this subsection shall survive notwithstanding any change in the person occupying the office of Commissioner of Social Security or any vacancy in such office."

42 U. S. C. § 405(h) provides:

"(h) Finality of Commissioner's decision

"The findings and decision of the Commissioner of Social Security after a hearing shall be binding upon all individuals who were parties to such hearing. No findings of fact or decision of the Commissioner of Social Security shall be reviewed by any person, tribunal, or governmental agency except as herein provided.

No action against the United States, the Commissioner of Social Security, or any officer or employee thereof shall be brought under section 1331 or 1346 of title 28 to recover on any claim arising under this subchapter."

42 U. S. C. § 1395ii provides:

"The provisions of sections 406 and 416(j) of this title, and of subsections (a), (d), (e), (h), (i), (j), (k), and (l) of section 405 of this title, shall also apply with respect to this subchapter to the same extent as they are applicable with respect to subchapter II of this chapter, except that, in applying such provisions with respect to this subchapter, any reference therein to the Commissioner of Social Security or the Social Security Administration shall be considered a reference to the Secretary or the Department of Health and Human Services, respectively."

28 U. S. C. § 1331 provides:

"Federal question. The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."

JUSTICE STEVENS, dissenting.

While I join JUSTICE THOMAS' lucid dissent without qualification, I think it worthwhile to identify a significant distinction between cases like *Weinberger* v. *Salfi*, 422 U. S. 749 (1975), and *Heckler* v. *Ringer*, 466 U. S. 602 (1984), on the one hand, and cases like *Bowen* v. *Michigan Academy of Family Physicians*, 476 U. S. 667 (1986), and this case, on the other hand. In the former group, the issue concerned the plaintiffs' entitlement to benefits; in the latter two, the issue concerns providers' eligibility for reimbursement. The distinction between those two types of issues mirrors a critical distinction between the Social Security Act, 42 U. S. C. § 405, and the Medicare Act, 42 U. S. C. § 1395ii.

Disputed claims for Social Security benefits always present a simple two-party dispute in which the claimant is seeking a monetary benefit from the Government. A proceeding under § 405 is correctly described as an action "to recover on any claim arising under this subchapter." § 405(h). Disputed claims under the Medicare Act, however, typically involve three parties—the patient, the provider, and the Secretary. When the issue involves a dispute over the patient's entitlement to benefits, it is fairly characterized as an action "to recover" on a claim that is parallel to a claim for Social Security benefits. The language in § 1395ii that makes § 405(h) applicable to the Medicare Act "to the same extent as" it applies to the Social Security Act thus encompasses claims by patients, but does not necessarily encompass providers' challenges to the Secretary's regulations.

In *Ringer,* the Court, in effect (and, in my view, erroneously), treated the patients' claim as a premature action "to recover" benefits that was subject to the strictures in § 405(h). See 466 U. S., at 620. But in this case, as in *Michigan Academy,* the plaintiffs are providers, not patients. Their challenges to the Secretary's regulations simply do not fall within the "to recover" language of § 405(h) that was obviously drafted to describe pecuniary claims. The incorporation of that language into the Medicare Act via § 1395ii provides no textual support for the Court's decision today. Moreover, contrary to the Court's "Pandora's box" rhetoric, *ante,* at 17–18, adherence to the plain meaning of "to recover" would not make it necessary for the Court to revisit any of its earlier cases. For this reason, as well as the reasons set forth by JUSTICE THOMAS, I find nothing in the relevant statutory text that should be construed to bar this action.

JUSTICE SCALIA, dissenting.

I join the opinion of JUSTICE THOMAS except for Part III, and think it necessary to add a few words in explanation

of that vote: I am doubtful whether *Bowen* v. *Michigan Academy of Family Physicians,* 476 U. S. 667 (1986), was correctly decided, but that case being on the books, and involving as it does a question of statutory interpretation, I believe it requires affirmance here. There is in my view neither any basis for holding that 42 U. S. C. § 1395ii has a different meaning with regard to Part A than with regard to Part B, nor (since repeals by implication are disfavored) any basis for holding that the subsequent addition of a judicial-review provision distantly related to § 1395ii altered the meaning we had authoritatively pronounced. See *post,* at 38, n. 7 (THOMAS, J., dissenting).

I do not join Part III of JUSTICE THOMAS's opinion because its reliance upon what it calls the presumption of pre-enforcement review suggests that *Michigan Academy* was *(a fortiori)* correctly decided. I might have thought, as an original matter, that the categorical language of §§ 1395ii and 405(h) overcame even what JUSTICE THOMAS acknowledges is the *stronger* presumption of *some* judicial review. See *post,* at 45. With regard to the timing of review, I would not even use the word "presumption" (a term which *Abbott Laboratories* v. *Gardner,* 387 U. S. 136 (1967), applies only to the preference for judicial review at *some* point, see *id.,* at 140), since that suggests that some unusually clear statement is required by way of negation. In my view, preenforcement review is better described as the background rule, which can be displaced by any reasonable implication ("persuasive reason to believe," as *Abbott Laboratories* put it, *ibid.*) from the statute.

JUSTICE THOMAS, with whom JUSTICE STEVENS and JUSTICE KENNEDY join, and with whom JUSTICE SCALIA joins except as to Part III, dissenting.

Unlike the majority, I take no position on how 42 U. S. C. § 405(h) applies to respondent's suit. That section is beside the point in this case because it does not apply of its own

force to the Medicare Act, but only by virtue of 42 U. S. C. § 1395ii, the Medicare Act's incorporating reference to § 405(h).[1] I read *Bowen* v. *Michigan Academy of Family Physicians*, 476 U. S. 667 (1986), to hold that this incorporating reference is triggered when a particular fact-bound determination is in dispute, but not in the case, as here, of a "challeng[e] to the validity of the Secretary's instructions and regulations." *Id.,* at 680. Though this (or any) interpretation of § 1395ii is not entirely free from doubt in light of the arguable tension between *Michigan Academy* and our earlier decision in *Heckler* v. *Ringer,* 466 U. S. 602 (1984), I would resolve such doubt by following our longstanding presumption in favor of preenforcement judicial review. Accordingly, I would hold that § 405(h) does not apply to respondent's challenge, and therefore does not preclude respondent from bringing suit under general federal-question jurisdiction, 28 U. S. C. § 1331.

I

A

*Michigan Academy* was the first time we discussed the meaning of § 1395ii. In earlier Medicare Act cases where the plaintiffs had sought to proceed under general federal-question jurisdiction, we either had no need to address § 1395ii, or assumed in passing (and without discussion) that § 1395ii *always* incorporates § 405(h).

Our decision in *United States* v. *Erika, Inc.,* 456 U. S. 201 (1982), involved the former situation. We dealt there with a Part B dispute over the appropriate amount of reimbursement for certain medical supplies.[2] The statute provided

---

[1] Section 1395ii provides in relevant part that the provisions of § 405(h) "shall also apply with respect to [the Medicare Act] to the same extent as they are applicable with respect to [the Social Security Act]."

[2] Part B of the Medicare Act provides voluntary supplemental insurance coverage to eligible individuals for certain physician charges and medical services that are not covered by Part A. Individuals' Part B benefits

for the determination of benefit amounts to be made by a private insurance carrier designated by the Secretary, and authorized *de novo* review of the initial determination by another officer designated by the carrier. *Id.*, at 203 (citing 42 U. S. C. § 1395u (1982 ed.)). But the statutory scheme did not mention the possibility of judicial review of Part B benefit amount determinations, much less review by the Secretary. By contrast, the statute did expressly provide for administrative review by the Secretary and judicial review in two instances: disputes concerning the claimant's eligibility for benefits under Part A or Part B, and disputes over benefit amount determinations *under Part A.* 456 U. S., at 207 (citing 42 U. S. C. § 1395ff (1982 ed.)). We found this contrast illuminating: "In the context of the statute's precisely drawn provisions, this omission provides persuasive evidence that Congress deliberately intended to foreclose further review of [Part B benefit amount determinations]." 456 U. S., at 208.[3] The inference was strong enough that we had no need to discuss the Government's alternative contention that § 405(h) expressly precluded a claim under general jurisdictional provisions. See *id.*, at 206, n. 6. We therefore had no occasion to decide whether § 1395ii even incorporates § 405(h) into the Medicare Act. (So too in *Weinberger* v. *Salfi*, 422 U. S. 749 (1975), we did not need to interpret § 1395ii, but for a different and more obvious reason: *Salfi* was a Social Security case, not a Medicare case, so § 405(h) was directly applicable.)

---

claims are routinely assigned to providers of services, who then seek reimbursement.

[3] Our decision in *Erika* illustrates the longstanding principle that a statute whose provisions are finely wrought may support the preclusion of judicial review, even though that preclusion is only by negative implication. See, *e. g., United States* v. *Fausto,* 484 U. S. 439, 452 (1988); *Block* v. *Community Nutrition Institute,* 467 U. S. 340, 351 (1984); *Switchmen* v. *National Mediation Bd.,* 320 U. S. 297, 305–306 (1943).

Our opinion in *Ringer* was equally silent on the meaning of § 1395ii, this time assuming in passing that it operates as a garden variety incorporating reference of § 405(h),[4] an assumption shared by the parties to the case, see Brief for Petitioners 18, 22, and Brief for Respondents 26–29, in *Heckler* v. *Ringer*, O. T. 1983, No. 82–1772. *Ringer* involved a dispute over reimbursement for a surgical procedure under Part A of the Act, see 466 U. S., at 608–609, n. 4, so, unlike in *Erika* (which involved Part B), it was clear that the individual plaintiffs could seek judicial review under § 1395ff (via § 405(g)) after they had presented a claim for benefits to the Secretary and suffered an unfavorable final decision. But the plaintiffs chose not to follow this route to review. Instead, they attempted to challenge the Secretary's policy prohibiting reimbursement for the surgery as violating constitutional due process and several statutory provisions, invoking general federal-question jurisdiction.[5] As noted, we assumed that § 1395ii incorporates § 405(h) in the situation of a preenforcement challenge to the Secretary's Medicare Act regulations and policies, and held that § 405(h)'s third sentence—"No action against the United States, the [Secretary], or any officer or employee thereof shall be brought under section 1331 or 1346 of title 28 to recover on any claim arising under this subchapter"—expressly precluded Ringer's suit. *Ringer*, 466 U. S., at 615–616.

---

[4] See *Heckler* v. *Ringer*, 466 U. S. 602, 614–615 (1984) ("The third sentence of 42 U. S. C. § 405(h), made applicable to the Medicare Act by 42 U. S. C. § 1395ii, provides that § 405(g), to the exclusion of 28 U. S. C. § 1331, is the sole avenue for judicial review for all 'claim[s] arising under' the Medicare Act" (alteration in original)).

[5] The plaintiffs also asserted, to no avail, that the District Court had jurisdiction under 28 U. S. C. § 1361 (mandamus) and 42 U. S. C. § 1395ff (1982 ed. and Supp. II) (judicial review of Part A benefit amount determinations). See *Ringer, supra,* at 617–618.

B

We squarely addressed § 1395ii for the first time in our 1986 decision in *Bowen* v. *Michigan Academy of Family Physicians*, 476 U. S. 667. The Secretary had adopted a regulation that authorized the payment of Part B benefits in different amounts for similar physicians' services. An association of family physicians and several individual doctors filed suit to challenge this regulation. *Id.*, at 668. These plaintiffs asserted no concrete claim to Part B benefits, for judicial review of such a claim was clearly foreclosed by the statute as interpreted in *Erika;* they instead invoked federal-question jurisdiction. Our unanimous opinion[6] in their favor began by rejecting the Secretary's contention that the provisions construed in *Erika* impliedly precluded review not only of benefit amount determinations under Part B, but also of challenges against the Secretary's methodologies for determining such amounts. 476 U. S., at 673. The "precisely drawn" provisions on which we had focused in *Erika* did not support the Secretary's proposed inference, as they "simply d[id] not speak to challenges mounted against the *method* by which such amounts are to be determined." 476 U. S., at 675.

We then turned to the Secretary's argument that § 405(h), incorporated by § 1395ii into the Medicare Act, *expressly* precludes a claimant from resorting to general federal-question jurisdiction under 28 U. S. C. § 1331. The Secretary contended that under *Salfi, supra,* at 756–762, and *Ringer, supra,* at 614–616, "the third sentence of § 405(h) by its terms prevents any resort to the grant of general federal-question jurisdiction contained in 28 U. S. C. § 1331." 476 U. S., at 679. The plaintiffs responded that § 405(h)'s third sentence precludes use of § 1331 only when Congress has provided specific procedures for judicial review of final

---

[6] Then-JUSTICE REHNQUIST did not participate.

agency action. *Ibid.* We declined, however, to enter that debate:

> "Whichever may be the better reading of *Salfi* and *Ringer*, we need not pass on the meaning of §405(h) in the abstract to resolve this case. Section 405(h) does not apply on its own terms to Part B of the Medicare program, but is instead incorporated *mutatis mutandis* by §1395ii. The legislative history of both the statute establishing the Medicare program and the 1972 amendments thereto provides specific evidence of Congress' intent to foreclose review only of 'amount determinations'—*i. e.*, those 'quite minor matters,' 118 Cong. Rec. 33992 (1972) (remarks of Sen. Bennett), remitted finally and exclusively to adjudication by private insurance carriers in a 'fair hearing.' By the same token, matters which Congress did *not* delegate to private carriers, such as challenges to the validity of the Secretary's instructions and regulations, are cognizable in courts of law. In the face of this persuasive evidence of legislative intent, we will not indulge the Government's assumption that Congress contemplated review by carriers of 'trivial' monetary claims, *ibid.*, but intended no review at all of substantial statutory and constitutional challenges to the Secretary's administration of Part B of the Medicare program." *Id.*, at 680 (footnotes omitted).

We accordingly held that the physicians' challenge to the Secretary's regulation could proceed under general federal-question jurisdiction.

## C

In light of the quoted passage, it is beyond dispute that our holding in *Michigan Academy* rested squarely on the meaning of §1395ii. Accord, *ante*, at 17. Under *Michigan Academy*, a case involving an "amount determinatio[n]" would trigger §1395ii's incorporation of §405(h), and thus bar federal-question jurisdiction; a "challeng[e] to the valid-

ity of the Secretary's instructions and regulations" would not. 476 U. S., at 680.

This dichotomy does not translate exactly to the instant case, the majority tells us, because the Secretary's determination to terminate a nursing home's provider agreement, see 42 U. S. C. §1395cc(b) (1994 ed. and Supp. III), in no sense resembles the determination of an "amount" of an individual's benefits under Part A or B, see §1395ff. Therefore, the majority concludes, *Michigan Academy*'s interpretation of §1395ii simply does not bear on respondent's challenge to the Secretary's regulations here. See *ante*, at 20.

But §1395ii applies to more than just §1395ff, the provision concerning benefit amounts; it applies, rather, to the entire Medicare Act, including §1395cc, the provision concerning provider agreements that *is* directly at issue here. And we have "stron[g] cause to construe a *single* formulation . . . the same way each time it is called into play." *Ratzlaf* v. *United States*, 510 U. S. 135, 143 (1994). Accordingly, the interpretation of §1395ii that we announced in *Michigan Academy* must have a more general import than a distinction between Part B benefits determinations, on the one hand, and Part B methods guiding such determinations, on the other. *Michigan Academy* must have established a distinction between, on the one hand, a dispute over *any* particularized determination and, on the other hand, a "challeng[e] to the validity of the Secretary's instructions and regulations," 476 U. S., at 680.[7] The former triggers §1395ii's incorporation of §405(h); the latter does not.

This case obviously falls into the latter category. Respondent in no way disputes any particularized determina-

---

[7] For this reason, it is beside the point that Congress amended §1395ff after *Michigan Academy* to make express provision for administrative and judicial review of Part B benefits claims. See Pub. L. 99–509, §9341(a)(1)(B), 100 Stat. 2037. Congress has *not* substantively amended §1395ii since *Michigan Academy*, and so *Michigan Academy*'s gloss on §1395ii deserves as much *stare decisis* respect today as it ever has.

tions, but instead mounts a general challenge to the Secretary's regulations (and manual) prescribing inspection and enforcement procedures for the teams that survey participating nursing homes, 59 Fed. Reg. 56116 (1994), claiming that these were promulgated without notice and comment, are unconstitutionally vague, contravene the Medicare Act's requirement of enforcement consistency, and violate due process by affording insufficient administrative review. Like the *Michigan Academy* plaintiffs, who challenged the Secretary's regulation concerning the payment of benefits for physicians' services, 476 U. S., at 668, respondent may proceed in District Court under general federal-question jurisdiction.

Perhaps recognizing that this result follows straightforwardly from what our *Michigan Academy* opinion actually says, the majority creatively recasts that decision as having established an exception to § 1395ii's incorporation of § 405(h): Section 1395ii will not apply "where its application to a particular category of cases, such as Medicare Part B 'methodology' challenges, would not lead to a channeling of review through the agency, but would mean no review at all." *Ante*, at 17. In doing so, the Court confuses the reasoning (more precisely, *one half* of the reasoning) of *Michigan Academy* with the holding in that case. In *Michigan Academy*, we undoubtedly relied on the reality that, if the challenge to the Secretary's regulations were not allowed to proceed under general federal-question jurisdiction, the Secretary's administration of Part B benefit amount determinations would be entirely insulated from judicial review, a result in tension with the "'strong presumption that Congress did not mean to prohibit all judicial review' of executive action."[8] 476 U. S., at 681 (quoting *Dunlop* v. *Bachow-*

---

[8] The majority opinion may enjoy the "virtu[e] of consistency with *Michigan Academy*'s actual language," *ante*, at 19—but only *some* of the language, and not the most important part. As I explain in the text, the language that the majority opinion purports to track merely sets forth one of the two rationales for the holding in *Michigan Academy*. My reading

*ski,* 421 U. S. 560, 567 (1975)). But we placed at least equal reliance on the legislative history of the 1972 amendments to the Medicare Act, see 476 U. S., at 680, and our *holding* was that challenges to particular determinations would trigger § 1395ii, whereas challenges to the Secretary's instructions and regulations governing particular determinations would not, *ibid.;* see *supra,* at 38. Indeed, in setting aside the physicians' argument that § 405(h) bars general federal-question jurisdiction only when Congress has provided "specific procedures . . . for judicial review of final action by the Secretary," *Michigan Academy, supra,* at 679–680, we expressly *declined* to decide the case by announcing the "exception" suggested by the majority. While we might have done so, cf. *Mathews* v. *Eldridge,* 424 U. S. 319, 328–330 (1976) (describing limited exception to § 405(g)'s requirement that Secretary's decision be "final" before judicial review may be sought), we simply did not phrase our holding in those terms.

## II

To be sure, the reading of *Michigan Academy* that I would adopt (and that the Court of Appeals adopted below, 143 F. 3d 1072, 1075–1076 (CA7 1998)), dictates a different result in the earlier *Ringer* case. In *Ringer,* recall, the respondents were individual Medicare claimants who brought a challenge to the Secretary's policy regarding payment of Medicare benefits for a specific surgical procedure. As noted, we (and the parties) simply assumed that § 1395ii's incorporating reference to § 405(h) was triggered by such a challenge, and proceeded directly to decide the case based on § 405(h). And yet, under *Michigan Academy*'s gloss on § 1395ii, we would never have reached § 405(h) because § 1395ii would not have

---

of *Michigan Academy,* not the majority's, is consistent with the language in *Michigan Academy* setting forth that case's *holding:* § 1395ii "foreclose[s] review only of 'amount determinations,' . . . [not] challenges to the validity of the Secretary's instructions and regulations." 476 U. S., at 680.

been activated by such a "challeng[e] to the validity of the Secretary's . . . regulatio[n]." 476 U. S., at 680.[9]

But it is one thing to conclude that the result in *Ringer* would have been different had we applied *Michigan Academy*'s § 1395ii analysis to that case; it is quite another to declare that *Michigan Academy* effected a *sub silentio* overruling of *Ringer*. Contrary to the majority's representation, *ante*, at 18, my approach entails only the former, and therefore does not offend *stare decisis* principles as a *sub silentio* overruling would. As noted, *supra*, at 35, our opinion in *Ringer* did not expressly decide the meaning of § 1395ii, assuming instead (as the parties had done) that § 1395ii functions as a garden variety incorporating reference, *i. e.*, that § 1395ii incorporates § 405(h) in every case involving the Medicare Act. Accordingly, "[t]he most that can be said is that the point was in the cas[e] if anyone had seen fit to raise it. Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents." *Webster* v. *Fall*, 266 U. S. 507, 511 (1925). See also, *e. g.*, *Lopez* v. *Monterey County*, 525 U. S. 266, 281 (1999) ("[T]his Court is not bound by its prior assumptions"); *United States* v. *L. A. Tucker Truck Lines, Inc.*, 344 U. S. 33, 38 (1952). In other words, *Michigan Academy* could not have overruled *Ringer* (*sub silentio* or otherwise) on a

---

[9] While I readily agree with the majority's observation that my reading of *Michigan Academy* implies a different result in *Ringer*, I fail to comprehend the majority's assertion that my view of *Michigan Academy* also implies a different result in *Weinberger* v. *Salfi*, 422 U. S. 749 (1975). See *ante*, at 18–19. As noted, *supra*, at 34, *Salfi* was a Social Security case, and so § 405(h) applied of its own force.

Our post-*Michigan Academy* cases are entirely consistent with my reading of *Michigan Academy*. For example, in *Your Home Visiting Nurse Services, Inc.* v. *Shalala*, 525 U. S. 449 (1999), the challenge was directed to a particular determination of reimbursement benefits, and we held that § 405(h), as incorporated into the Medicare Act by § 1395ii, precluded resort to general federal-question jurisdiction.

point that *Ringer* did not decide. The majority opinion can therefore claim no support from its asserted "consistency with the holdings of earlier cases such as *Ringer.*" *Ante*, at 19. *Ringer* simply does not constitute a holding on the meaning of § 1395ii; or if it does, the majority has engaged in the very practice it condemns—a *sub silentio* overruling (of *Webster* v. *Fall, supra*).

Moreover, the majority's criticism of my approach as declaring a *sub silentio* overruling is just as well directed at itself, for *Ringer* is no less overruled by the majority's view of *Michigan Academy* than by my own. According to the majority, the *Michigan Academy* "exception" to § 1395ii applies where the aggrieved party "can obtain no review at all unless it can obtain judicial review in a § 1331 action." *Ante*, at 20. Consider how this test would apply to Freeman Ringer, one of the four plaintiffs in *Ringer.* Ringer sought to challenge the Secretary's policy proscribing reimbursement for a certain type of surgery (a Part A benefits issue), invoking general federal-question jurisdiction. He had no concrete reimbursement claim to present, for he did not possess the financial means to pay for the surgery up front and await reimbursement. Nor, apparently, could he obtain private financing for the surgery. See *Ringer*, 466 U. S., at 620; *id.*, at 637, n. 24 (STEVENS, J., concurring in judgment in part and dissenting. in part) ("Ringer would like nothing more than to give the Secretary [the] opportunity [to rule on a concrete claim for reimbursement]"); Brief for Petitioners 42–43, n. 23. It seems to me that Ringer is the paradigmatic example of a party who "can obtain no review at all unless [he] can obtain judicial review in a § 1331 action," *ante*, at 20, such that he plainly would qualify for the *Michigan Academy* exception to § 1395ii as described by the majority.

The majority purports to reaffirm *Ringer in toto*, but it does so only by revising that case to hold that Ringer, notwithstanding his own inability to obtain judicial review with-

out an anticipatory challenge, did not qualify for the *Michigan Academy* exception to §1395ii because others in his class could afford to pursue review by undergoing the surgery and presenting a concrete claim for reimbursement. See *ante*, at 12. Setting aside the peculiarity of interpreting a statute to deny judicial review to the poor with the promise that the rich will obtain review in their stead,[10] the majority's gloss on *Ringer* ignores the *Ringer* Court's own description of its holding. In rejecting plaintiff Ringer's attempt to use §1331, the *Ringer* Court did not rely on some notion that Ringer or those similarly situated to him could as a practical matter seek judicial review through some means other than §1331; the Court instead reasoned that Ringer's claim was "essentially one requesting the payment of benefits for [a particular] surgery, a claim cognizable only under §405(g)." 466 U. S., at 620.

### III

It would overstate matters to say that the foregoing analysis demonstrates beyond question that respondent may invoke general federal-question jurisdiction. Any remaining doubt is resolved, however, by the longstanding canon that "judicial review of executive action 'will not be cut off unless there is persuasive reason to believe that such was the purpose of Congress.'" *Gutierrez de Martinez* v. *Lamagno*, 515 U. S. 417, 424 (1995) (quoting *Abbott Laboratories* v. *Gardner*, 387 U. S. 136, 140 (1967)). See also, *e. g.*, *McNary* v. *Haitian Refugee Center, Inc.*, 498 U. S. 479, 496 (1991);

---

[10] The majority attempts to soften the blow by explaining that "individual hardship may be mitigated in a different way, namely, through excusing a number of the steps in the agency process, *though not the step of presentment of the matter to the agency.*" *Ante*, at 23 (emphasis added). But the italicized words show why the majority's concession provides cold comfort to a plaintiff like Ringer—or, arguably, the nursing homes represented by respondent here, see *ante*, at 21–22—who cannot afford to present a concrete claim to the agency, and thus can obtain neither administrative nor judicial review.

*Traynor* v. *Turnage*, 485 U. S. 535, 542 (1988); *Michigan Academy*, 476 U. S., at 670; *Johnson* v. *Robison*, 415 U. S. 361, 373–374 (1974); *Stark* v. *Wickard*, 321 U. S. 288, 309–310 (1944).

The rationale for this "presumption," *Abbott Laboratories, supra*, at 140, is straightforward enough: Our constitutional structure contemplates judicial review as a check on administrative action that is in disregard of legislative mandates or constitutional rights. As Chief Justice Marshall explained:

> " 'It would excite some surprise if, in a government of laws and of principle, furnished with a department whose appropriate duty it is to decide questions of right, not only between individuals, but between the government and individuals; a ministerial officer might, at his discretion, issue this powerful process . . . leaving to [the claimant] no remedy, no appeal to the laws of his country, if he should believe the claim to be unjust. But this anomaly does not exist; this imputation-cannot be cast on the legislature of the United States.' " *United States* v. *Nourse*, 9 Pet. 8, 28–29 (1835) (as quoted in *Gutierrez de Martinez, supra*, at 424).

See also S. Breyer, R. Stewart, C. Sunstein, & M. Spitzer, Administrative Law and Regulatory Policy 832 (4th ed. 1999) (suggesting that "the presumption of review owes its source to considerations of accountability and legislative supremacy, ideas embodied in article I, and also to rule of law considerations, embodied in the due process clause"); *Michigan Academy, supra*, at 681–682, n. 12 (noting that interpreting statute to allow judicial review would avoid the serious constitutional issue that would arise if a judicial forum for constitutional claims were denied).[11]

---

[11] We have observed that Congress "reinforced" the presumption by enacting the Administrative Procedure Act (APA), which "embodies the basic presumption of judicial review to one 'suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action

Contrary to the Secretary's representation, Brief for Petitioners 31–32, the presumption favors not merely judicial review "at some point," but *preenforcement* judicial review. While it is true that the presumption may not be quite as strong when the question is now-or-later instead of now-or-never, see *Thunder Basin Coal Co.* v. *Reich,* 510 U. S. 200, 207, n. 8, 215, n. 20 (1994), our cases clearly establish that the presumption applies in the former context. Indeed, *Abbott Laboratories,* the "important case . . . which marks the recent era of increased access to judicial review," Breyer, *supra,* at 831, itself involved a preenforcement challenge to a regulation. Although the Food, Drug, and Cosmetic Act (FDCA) did not authorize a preenforcement challenge to the type of regulation the Secretary had issued, and indeed expressly enumerated certain *other* kinds of regulations for which preenforcement review was available, we explained that these indicia of congressional intent must be viewed through the lens of the presumption:

> "The first question we consider is whether Congress by the [FDCA] intended to forbid pre-enforcement review of this sort of regulation promulgated by the Commissioner. The question is phrased in terms of 'prohibition' rather than 'authorization' because a survey of our cases shows that judicial review of a final agency action by an aggrieved person will not be cut off unless there is persuasive reason to believe that such was the purpose of Congress." *Abbott Laboratories,* 387 U. S., at 139–140.

We thus held that the suit could proceed. *Id.,* at 148.

More recently, in *Haitian Refugee Center,* we reaffirmed the applicability of the presumption in the context of a preenforcement challenge. At issue in that case was the constitutionality of the Immigration and Naturalization Service's

within the meaning of a relevant statute.'" *Abbott Laboratories* v. *Gardner,* 387 U. S. 136, 140 (1967) (quoting 5 U. S. C. § 702 (1964 ed., Supp. III)).

46

(INS) procedures for administering an amnesty program for illegal aliens. Despite the availability of judicial review of these procedures in the context of statutorily authorized review of orders of exclusion or deportation, and notwithstanding the statute's express prohibition of judicial review of an INS "determination respecting an application for adjustment of status [under the amnesty program]," 8 U. S. C. § 1160(e)(1), we held that these factors did not suffice to trump the "strong presumption in favor of judicial review of administrative action." *Haitian Refugee Center*, 498 U. S., at 498.

The majority declines to employ the presumption in favor of preenforcement review to resolve the ambiguity in § 1395ii; instead, it concocts a presumption *against* preenforcement review, stating that its holding is "consisten[t] with the distinction that this Court has often drawn between a total preclusion of review and postponement of review." *Ante,* at 19 (citing *Salfi,* 422 U. S., at 762; *Thunder Basin Coal, supra,* at 207, n. 8; *Haitian Refugee Center, supra,* at 496–499). But *Thunder Basin Coal,* as noted, *supra,* at 45, teaches only that the presumption is not as strong when the problem is one of delayed judicial review rather than complete denial of judicial review—it does not establish that the presumption lacks *any* force in the former context. And *Haitian Refugee Center* directly *supports* the applicability of the presumption in favor of preenforcement review; we there invoked the presumption even though the plaintiffs had a postenforcement review option—voluntarily surrendering themselves for deportation and availing themselves of the statutorily authorized judicial review of an order of exclusion or deportation. 498 U. S., at 496. Only *Salfi* provides the majority with modest support insofar as it acknowledged (and distinguished) just the presumption against the *complete* denial of judicial review, 422 U. S., at 762, omitting mention of the presumption against delayed judicial review. But this omission is readily explained: Presentment of a Social

Security benefits claim for purposes of 42 U. S. C. § 405(g) is accomplished by the near-costless act of filing an application for benefits, to be contrasted with the extremely burdensome presentment requirement facing the aliens in *Haitian Refugee Center* or the named plaintiff in *Ringer*. The only significant hardship facing the claimants in *Salfi* arose from the possibility that a lengthy administrative review process would postpone a judicial decision ordering the Secretary to pay the disputed benefits; but the Court took care of that problem by leniently construing § 405(g)'s requirement of a "final" agency decision and by allowing the Secretary to waive entirely § 405(g)'s requirement that decision be made "after a hearing." At bottom, then, the majority cannot demonstrate why the presumption in favor of preenforcement review, which dates at least from *Abbott Laboratories*, should not be invoked to resolve the debate between our conflicting readings of § 1395ii.

There is a practical reason why we employ the presumption not only to questions of whether judicial review is available, but also to questions of *when* judicial review is available. Delayed review—that is, a requirement that a regulated entity disobey the regulation, suffer an enforcement proceeding by the agency, and only then seek judicial review—may mean no review at all. For when the costs of "presenting" a claim via the delayed review route exceed the costs of simply complying with the regulation, the regulated entity will buckle under and comply, even when the regulation is plainly invalid. See Seidenfeld, Playing Games with the Timing of Judicial Review, 58 Ohio St. L. J. 85, 104 (1997). And we can expect that this consequence will often flow from an interpretation of an ambiguous statute to bar preenforcement review. In *Haitian Refugee Center*, for example, the aliens' "postenforcement" review option for asserting their challenge to the agency's procedures required the aliens to voluntarily surrender themselves for deportation, suffer an order of deporta-

tion, and seek judicial review of that order in the court of appeals. These costs of presentment, we explained, were "[q]uite obviously . . . tantamount to a complete denial of judicial review for most undocumented aliens." 498 U. S., at 496–497.

A similar predicament faces the nursing homes represented by respondent in the instant case, who contend that the Secretary's regulations (and manual) governing enforcement of substantive standards are unlawful in various respects. The nursing homes' "postenforcement" review route is delineated by 42 U. S. C. § 1395cc(h)(1), which provides that "an institution or agency dissatisfied . . . with a determination described in subsection (b)(2) of this section shall be entitled to a hearing thereon by the Secretary (after reasonable notice) to the same extent as is provided in section 405(b) of this title, and to judicial review of the Secretary's final decision after such hearing as is provided in section 405(g) of this title." While the meaning of "determination" in the referenced 42 U. S. C. § 1395cc(b)(2) (1994 ed., Supp. III) is not entirely free from doubt, the Secretary has interpreted these provisions to mean that administrative and judicial review is afforded for "any determination that a provider has failed to comply substantially with the statute, agreements, or regulations, whether termination or *some other remedy* is imposed.'" *Ante*, at 21 (quoting Reply Brief for Petitioners 14 (emphasis in original)). Still, even under the Secretary's reading, an inspection team's assessment of a deficiency (for noncompliance) against the nursing home does not suffice to trigger administrative and judicial review under § 1395cc(h). Presentment of a claim via § 1395cc(h) requires the nursing home not merely to expose itself to an assessment of a deficiency by an inspection team, but also to forbear correction of the deficiency until the Secretary (or her state designees) impose a remedy.

Respondent and its *amici* advance several plausible reasons why such forbearance will prove costly—indeed, costly

enough that compliance with the challenged regulations and manual is the more rational option. For one, nursing homes face the prospect of termination—the most severe of remedies—simply by virtue of failing to submit a voluntary plan of correction and correct the deficiencies. See 42 CFR § 488.456(b)(1) (1998). The Secretary's only response is that terminations are rarely imposed in fact, and certainly are not imposed where the provider has postponed correction of its deficiencies in order to preserve its appeal rights. But any such leniency is solely a matter of grace by the Secretary, see Tr. of Oral Arg. 31, and provides little comfort to a nursing facility pondering the § 1395cc(h) route to judicial review. And exposure to the termination remedy is not the only consequence faced by a nursing home that forestalls correction of its deficiencies. The Secretary also may impose civil monetary penalties, which accrue for each day of noncompliance, 42 CFR §§ 488.430, 488.440(b) (1998), and thus quite plainly stand as a calibrated deterrent to the forbearance strategy. Cf. *Ex parte Young*, 209 U. S. 123, 148 (1908) ("[T]o impose upon a party interested the burden of obtaining a judicial decision . . . only upon the condition that if unsuccessful he must suffer imprisonment and pay fines . . . is, in effect, to close up all approaches to the courts").[12] Other costs of the forbearance strategy are less tangible, but potentially as significant. For example, a finding of a deficiency at a nursing facility—which may well rest on unbalanced or inaccurate data—is posted in a place easily accessible to residents, 42 CFR § 483.10(g)(1) (1998), disclosed

---

[12] In *Thunder Basin Coal Co.* v. *Reich*, 510 U. S. 200 (1994), the aggrieved mine operator was similarly subject to civil penalties ($5,000) for each day of noncompliance with statutory provisions, which would become final and payable after review by the agency and the appropriate court of appeals. *Id.*, at 204, n. 4, 218. But, unlike the nursing homes at issue here, the aggrieved mine operator apparently had the option of complying and then bringing a judicial challenge. See *id.*, at 221 (SCALIA, J., concurring in part and concurring in judgment).

to the public, 42 U. S. C. § 1395i–3(g)(5)(A), and posted on the Health Care Finance Authority's Internet website, Reply Brief for Petitioners 20, n. 20.[13] Such negative publicity, which occurs before the nursing home may avail itself of administrative or judicial review via § 1395cc(h), is likely to result in substantial reputational harm. See *Gardner* v. *Toilet Goods Assn., Inc.*, 387 U. S. 167, 172 (1967) ("Respondents note the importance of public good will in their industry, and not without reason fear the disastrous impact of an announcement that their cosmetics have been seized as 'adulterated'").

I recount these allegations of hardship to respondent's members not because they inform any case-by-case application of the presumption in favor of preenforcement review, but rather because such concerns motivate the presumption in a general sense. A case-by-case inquiry into hardship is accommodated instead by ripeness doctrine, which "evaluate[s] both the fitness of the issues for judicial decision and the *hardship to the parties of withholding court consideration.*" *Abbott Laboratories*, 387 U. S., at 149 (emphasis added). I read our cases to establish just this sort of analysis: (1) in light of the presumption, construe an ambiguous statute in favor of preenforcement review; (2) apply ripeness doctrine to determine whether the suit should be entertained. Thus, in *Abbott Laboratories* and its two companion cases, we construed an ambiguous statute to permit preenforcement review, see *id.*, at 148; *Gardner* v. *Toilet Goods Assn., supra*, at 168; *Toilet Goods Assn., Inc.* v. *Gardner*, 387 U. S. 158, 160 (1967), but we then proceeded to hold that only the suits in the first two of these cases were

---

[13] While the Secretary represents, Reply Brief for Petitioners 20, n. 20, and the Court accepts, *ante*, at 22, that a deficient nursing home may post a response on the website, respondent's *amici* American Health Care Association et al. assert that the website does not accommodate provider comments, but only lists the date a facility has corrected a deficiency, Brief for American Health Care Association et al. as *Amici Curiae* 18.

ripe, *Abbott Laboratories, supra,* at 156; *Gardner* v. *Toilet Goods Assn., supra,* at 170; *Toilet Goods Assn.* v. *Gardner, supra,* at 160–161. See also *Reno* v. *Catholic Social Services, Inc.,* 509 U. S. 43, 56–66 (1993) (similar). In line with this mode of analysis, the court below, after concluding that the Medicare Act does not preclude general federal-question jurisdiction over a preenforcement challenge to the Secretary's regulations, held that respondent's APA notice-and-comment challenge was ripe but that its constitutional vagueness claim was not. 143 F. 3d, at 1076–1077.

While I express no view on the proper application of ripeness doctrine to respondent's claims,[14] I am confident that this method of analysis enjoys substantially more support in our cases than does the majority's approach, which prescribes a case-by-case hardship inquiry at the threshold stage of determining whether preenforcement review has been precluded by statute. See *ante,* at 20 (holding that § 1395ii does not incorporate § 405(h) where the aggrieved party "can obtain no review at all unless it can obtain judicial review in a § 1331 action"). While the majority's variation would be harmless if its hardship test were no more stringent than the hardship prong of ordinary ripeness doctrine, I presume its test is more exacting—otherwise the majority opinion is no more than a well-disguised application of ripeness doctrine to the facts of this case.[15] At bottom, then, the majority superimposes a more burdensome hardship test on ordinary ripeness doctrine for aggrieved persons who

---

[14] The Secretary did not seek review of the Court of Appeals' holding that respondent's APA notice-and-comment challenge is ripe, Pet. for Cert. I, and this Court denied respondent's cross-petition for certiorari seeking review of the Court of Appeals' holding that respondent's vagueness challenge is not ripe, 526 U. S. 1067 (1999).

[15] The majority acknowledges that its hardship test is more burdensome than the hardship prong of ripeness doctrine in at least one respect. We are told that the relevant hardship is not that endured by the "individual plaintiff," but rather that confronted by the "class" of persons similarly situated to the individual plaintiff. *Ante,* at 22–23; see *supra,* at 42–43.

seek to bring a preenforcement challenge to the Secretary's regulations under the Medicare Act.[16]

\*   \*   \*

Instead, I would hold that § 1395ii, as interpreted by *Michigan Academy*, does not in this case incorporate § 405(h)'s preclusion of federal-question jurisdiction, especially in light of the presumption in favor of preenforcement review. I respectfully dissent.

---

[16] The majority betrays its misunderstanding of the relationship between the presumption in favor of preenforcement review and ripeness doctrine when it says that "any . . . presumption [in favor of preenforcement review] must be far weaker than a presumption against preclusion of all review in light of the traditional ripeness doctrine, which often requires initial presentation of a claim to an agency." *Ante*, at 19–20. I do not dispute that respondent must demonstrate that its claims are ripe before the District Court may entertain respondent's preenforcement challenge. My point is only that respondent should be *permitted* to make its ripeness argument and to have that argument assessed according to traditional ripeness doctrine, rather than facing statutory preclusion of review by (inevitably) failing the majority's "super-hardship" test. As I explained, *supra*, at 50, our cases establish a two-step analysis: (1) in light of the presumption in favor of preenforcement review, construe an ambiguous statute to allow preenforcement review; (2) apply ripeness doctrine to determine whether the suit should be entertained.