Michael J. Truncale, United States District Judge
Plaintiff True Health Diagnostics LLC ("THD") moves for a preliminary injunction against Defendants Alex M. Azar, II, the United States Department of Health and Human Services Secretary, and Seema Verma, Administrator of the Centers for Medicare and Medicaid Services (collectively, "CMS"), seeking to enjoin CMS from "suspending, escrowing, recouping, or withholding any Medicare or Medicaid *675 Payments from True Health." [Dkt. 20]. CMS opposes the Motion, asserting that the Court lacks subject-matter jurisdiction and that THD fails to carry its burden of establishing all four elements needed for a preliminary injunction. [Dkt. 25]. Because the Court finds that it lacks subject-matter jurisdiction, THD's Motion for a Preliminary Injunction is DENIED. But even if the Court had subject-matter jurisdiction, THD's Motion would be denied because Plaintiff failed to meet its burden of establishing all four elements for a preliminary injunction.
I. FACTUAL AND PROCEDURAL BACKGROUND
THD provides nationwide diagnostic services, consisting primarily of blood and urine testing, for Medicare beneficiaries. THD provides such services by (1) testing samples from physicians in their lab in either Frisco, Texas, or Richmond, Virginia; or (2) managing outpatient labs in hospitals partnered with THD. Most of THD's 400 employees are lab technicians and billers. Approximately 20% of all THD patients are currently Medicare patients, and 30% of THD revenue comes from CMS [Dkt. 3-2, ¶ 4]. Private providers supply the remaining 70% of revenue.
A. 2017 and 2019 CMS Payment Suspensions
On May 25, 2017, CMS suspended 100% of THD's Medicare payments, without prior notice, based on "credible allegations of fraud" pursuant to 42 C.F.R. § 405.372(a)(4).[1] [Pl.'s Ex. A, Dkt. 35]. As part of its May 26, 2017 letter of suspension (the "May 2017 Letter"), CMS listed eight claims, including claim control numbers and dates of services, that failed to meet Medicare guidelines. [Pl.'s Ex. A, Dkt. 35]. The May 2017 Letter noted that the list of eight claims "is not exhaustive or complete in any sense, as the investigation into this matter is continuing." [Pl.'s Ex. A, Dkt. 35]. THD submitted a rebuttal statement on June 5, 2017 [Pl.'s Ex. B, Dkt. 35], and CMS responded with a refusal to lift the suspension [Pl.'s Ex. C, Dkt. 35]. On June 23, 2017, CMS reduced the suspension to 35% (the "2017 Suspension"). [Dkt. 9-1].
On June 11, 2019, while the 2017 Suspension was in place, CMS implemented a second suspension of Medicare payments based on "recent credible allegations of fraud" (the "2019 Suspension"). The June 13, 2019 letter of suspension (the "June 2019 Letter") concerning the second suspension explained that the 2019 Suspension "is distinct from the suspension that was implemented on May 25, 2017." [Pl.'s Ex. I, Dkt. 35]. The June 2019 Letter provided a list of five allegedly fraudulent claims and, like the May 2017 Letter, noted that the list "is not exhaustive or complete in any sense." [Pl.'s Ex. I, Dkt. 35]. THD submitted its rebuttal statement concerning the 2019 suspension on June 25, 2019. [Pl.'s Ex. J, Dkt. 35].
On July 2, 2019, THD brought suit against CMS for the 2017 and 2019 Suspensions. Specifically, THD alleges five causes of action for CMS's actions: (1) violation of procedural due process; (2) violation of substantive due process; (3) violation of the Administrative Procedure Act; (4) mandamus; and (5) declaratory judgment. [Dkt. 2].
*676 The next day, on July 3, 2019, THD filed an Emergency Motion for a Temporary Restraining Order, seeking a temporary restraining order ("TRO") that enjoins CMS from "suspending, escrowing, or withholding any further Medicare or Medicaid reimbursements for such a time as to allow the parties to brief and argue a motion for a preliminary injunction" and for the "release of the checks that CMS has made out to True Health since June 13, 2019, but not delivered." [Dkt. 3 at 2]. THD argued that it has a substantial likelihood of success on its due process claims, it would suffer irreparable harm in the form of bankruptcy or liquidation by July 8 if not provided injunctive relief, the balance of hardships favors THD, and the injunctive relief would serve the public interest. CMS responded to the TRO motion on July 5, 2019. [Dkt. 9 & 10].
On July 5, 2019, CMS issued a letter notifying THD of an overpayment determination as to the 2017 suspension and issued several letters to THD through Qlarant, a Medicare contractor, informing THD of the following:
• CMS terminated the 35% 2017 suspension but that "[t]he separate 100% payment suspension that was implanted on June 11, 2019 will remain in effect." [Pl.'s Ex. K, Dkt. 35].
• CMS determined that THD received an overpayment of $27,467,142.30 for Medicare services. [Pl.'s Ex. K, Dkt. 35].
• The CDs attached to the second and third letter contained encrypted results of the overpayment determination, including details for each claim line reviewed. [Pl.'s Ex. K, Dkt. 35].
Novitas Solutions, another Medicare contractor, issued two more letters to THD that explained why THD was responsible for the overpayment, the rebuttal process, interest assessment, recoupment, payment for the overpay amount, the appeals process, and various other actions THD may take after receiving the overpayment determination. [Dkt. 29-1, 29-2].[2]
On July 8, 2019, the Court granted the TRO. [Dkt. 12]. Neither party provided the Court with evidence of CMS's overpayment determination of the 2017 Suspension until after it had entered the TRO. The TRO preserved the status quo of a 35% suspension by enjoining CMS "from suspending, escrowing, or otherwise withholding more than 35% of True Health's Medicare or Medicaid payments" until July 18, 2019. [Dkt. 12]. The Court also ordered THD to pay a nominal bond for the TRO. [Dkt. 23]. THD subsequently filed a Motion for Preliminary Injunction. [Dkt. 20]. CMS timely responded to the Preliminary Injunction Motion, arguing the injunction should be denied because the Court lacks subject-matter jurisdiction and that THD fails to meet its burden of establishing all four elements for a preliminary injunction. [Dkt. 25].
On July 17, 2019, the Court held a show cause hearing for the preliminary injunction with all parties and counsel present. Christian Richards, THD's Chief Financial *677 Officer, testified at the hearing. THD also conceded at the hearing that because CMS has made an overpayment determination concerning the 2017 Suspension, THD can now begin the administrative appeals process for the 2017 Suspension. As of this Order, CMS has made no overpayment determination concerning the June 2019 Suspension.
B. The Administrative Process for Medicare Claims
Medicare is the federal medical insurance program for the aged and disabled. 42 U.S.C. § 1395 et seq. A company's participation in the Medicare program is completely voluntary. See 42 C.F.R. § 489.10. The Secretary for the Department of Health and Human Services ("HHS") operates Medicare through CMS, which in turn hires contractors to perform administrative functions on CMS's behalf. 42 U.S.C. § 1395u.
Medicare is a pay-first system. That is, once a Medicare provider submits claims for payment-without any records, documents, or proof that the services were provided or that the services meet Medicare requirements-CMS, through its contractors, automatically pays those claims within a couple of weeks after submission.
CMS can suspend payments, "in whole or in part," when it determines "a credible allegation of fraud exists against a provider or supplier." 42 C.F.R. § 405.371(a)(2). "A credible allegation of fraud is an allegation from any source, including but not limited to the following: (1) Fraud hotline complaints[,] (2) Claims data mining[,] (3) Patterns identified through provider audits, civil false claims cases, and law enforcement investigations." 42 C.F.R. § 405.370(a). "Allegations are considered to be credible when they have indicia of reliability." Id. In cases of suspected fraud, CMS need not issue a notice to the supplier prior to suspension. 42 C.F.R. § 405.372(a)(4).
When CMS suspends a provider or supplier's payments, it must provide the suspended entity an opportunity to submit a rebuttal statement as to why CMS should end the suspension. 42 C.F.R. §§ 405.373(a)(2) ; 405. 374. CMS must then respond to the rebuttal within 15 days with a "notification of determination" that contain "specific findings on the conditions upon which the suspension is initiated, continued, or removed and an explanatory statement of the determination." 42 C.F.R. § 405.375(b)(2). This determination is not appealable and "is not an initial determination" within the Medicare Act administrative process. Id. Cf. 42 C.F.R. § 405.924 (listing actions that are considered initial determinations).
After suspending payments, CMS must reevaluate every 180 days whether good cause exist to not continue the suspension. 42 C.F.R. § 405.371(b)(2)(i). In addition to reevaluating good cause every 180 days, CMS must also request a certification from the Office of Inspector General ("OIG") or other law enforcement agency "that the matter continues to be under investigation warranting continuation of the suspension" for each 180-day period. 42 C.F.R. § 405.371(b)(2)(ii). CMS must end the suspension after 18 months, unless the case has been referred to, and is being considered by, the OIG for administrative action or the Department of Justice requests that the suspension continue. 42 C.F.R. § 405.371(b)(3)(ii).
During the suspension period, CMS processes all claims received and determine whether the services provided were proper or if overpayment occurred. The allowable amounts are set aside, effectively held in escrow, until the investigation is completed. If at the end of the investigation CMS finds overpayment, then the funds held in *678 escrow are first applied "to reduce or eliminate any overpayments determined by the Medicare contractor, or CMS, including any interest" and then applied to "reduce any other obligation to CMS or to HHS." 42 C.F.R. § 405.372(e). Any remaining funds in escrow will be released to the provider or supplier. Id. Alternatively, if the suspended funds are insufficient to fully remedy the overpayment, then CMS will institute recoupment by garnishing future reimbursements that are otherwise due to the provider or supplier. 42 U.S.C. § 1395ddd(f)(2) ; 42 C.F.R. § 405.371(a)(3). If CMS determines no overpayment occurred, then all escrow funds are released to the provider or supplier. 42 C.F.R. § 405.372(e).
Once CMS determines that there has been an overpayment, it sends an overpayment determination and demand letter to the provider or supplier. This initial overpayment determination triggers the multi-step administrative appeals process for a provider or supplier to follow if it is dissatisfied with the initial overpayment determination. 42 C.F.R. § 405.904(a)(2). The administrative appeal steps are as follows:
(1) A redetermination of the initial determination of overpayment by a Medicare administrative contractor. ( 42 U.S.C. § 1395ff(a)(3)(A) ; 42 C.F.R. § 405.940 et seq. );
(2) A reconsideration by a Qualified Independent Contractor ("QIC") ( 42 U.S.C. § 1395ff(c), (g) ; 42 C.F.R. § 405.960 et seq. );
(3) A de novo review and hearing before an Administrative Law Judge ("ALJ") ( 42 U.S.C. § 1395ff(d) ; 42 C.F.R. §§ 405.1002(a)(2), 405.1006(b) ); and
(4) A review and decision by the Medicare Appeals Council ("MAC"), which is considered a final decision of the Secretary ( 42 U.S.C. § 1395ff(b) ; 42 C.F.R. § 405.1102(a) ).
A provider or supplier may only seek review in a federal district court after a receiving a decision from the MAC. 42 U.S.C. § 1395ff(b)(1)(A) ; 42 C.F.R. § 405.1136 ; 42 C.F.R. § 405.1130.
II. APPLICABLE LAW
A party seeking a preliminary injunction must establish four elements: (1) a substantial likelihood of success; (2) a substantial threat that plaintiff will suffer irreparable harm if the injunction is not granted; (3) that the threatened injury outweighs any damage that the injunction might cause the defendant; and (4) that the injunction will not disserve the public interest. Nichols v. Alcatel USA, Inc. , 532 F.3d 364, 372 (5th Cir. 2008). "A preliminary injunction is an extraordinary remedy and should only be granted if the plaintiffs have clearly carried the burden of persuasion on all four requirements." Id. ; Black Fire Fighters Ass'n v. City of Dallas , 905 F.2d 63, 65 (5th Cir. 1990). The decision to grant a preliminary injunction lies within the sound discretion of the court. Weinberger v. Romero-Barcelo , 456 U.S. 305, 320, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982).
III. DISCUSSION
A. The Court lacks subject-matter jurisdiction.
THD alleges this Court has subject-matter jurisdiction pursuant to: (1) federal question ( 28 U.S.C. § 1331 ) and 42 U.S.C. § 405(g) ; (2) mandamus jurisdiction ( 28 U.S.C. § 1361 ); (3) the All Writs Act ( 28 U.S.C. § 1651(a) ); (4) Bivens jurisdiction; (5) the Court's inherent equity powers; and (6) the Court's power to preserve its own jurisdiction. [Dkt. 2, ¶ 17]. CMS contends none of those provide this court with subject-matter jurisdiction.
*679 1. This Court lacks federal question jurisdiction.
Although federal courts have original jurisdiction in actions "arising under the Constitution, laws, or treaties of the United States" ( 28 U.S.C. § 1331 ), absent administrative exhaustion, Medicare cases are generally excluded from this general grant of federal-question jurisdiction. Family Rehab., Inc. v. Azar , 886 F.3d 496, 501, n.4 (5th Cir. 2018). This is because "[t]he Medicare act severely restricts the authority of federal courts by requiring 'virtually all legal attacks under the Act be brought through the agency.' " Physician Hosps. of Am. v. Sebelius , 691 F.3d 649, 653 (5th Cir. 2012) (quoting Shalala v. Ill. Council on Long Term Care, Inc. , 529 U.S. 1, 13, 120 S.Ct. 1084, 146 L.Ed.2d 1 (2000) ). "By statute, claims under Medicare must first be presented to the HHS Secretary." Id.
Federal courts are vested with jurisdiction over only a "final decision of HHS when dealing with claims "arising under" the Medicare Act. 42 U.S.C. § 405(g) and (h).[3] A claim arises under the Medicare Act for purposes of federal question jurisdiction "if the claim is inextricably intertwined with a claim for Medicare benefits." RenCare, Ltd. v. Humana Health Plan of Texas, Inc. , 395 F.3d 555, 557 (5th Cir. 2004) (internal quotations omitted). The term "arising under" is broadly construed to encompass all claims for relief, regardless of whether the claimant seeks benefits, or declaratory or injunctive relief. Heckler v. Ringer , 466 U.S. 602, 615, 104 S.Ct. 2013, 80 L.Ed.2d 622 (1984).
To determine whether subject-matter jurisdiction exists under 42 U.S.C. § 405(g), court apply a two-prong test: (1) "there must have been a presentment to the Secretary"; and (2) "the claimant must have exhausted his administrative review." Affiliated Prof'l Home Health Care Agency v. Shalala , 164 F.3d 282, 284 (5th Cir. 1999) (citing Mathews v. Eldridge , 424 U.S. 319, 328, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) ). The first element, presentment, can never be waived and "no decision of any type can be rendered if this requirement is not satisfied." Id. The second element, exhaustion, may be deemed waived if (a) the claims are "entirely collateral" to a substantive agency decision, and (b) "full relief cannot be obtained at a post-deprivation hearing." Family Rehab. v. Azar , 886 F.3d 496, 501 (5th Cir. 2018).
Because the parties agree the claims arise under the Medicare Act, the Court need only to determine whether it has subject-matter jurisdiction under the two-prong Eldridge test.
a. THD fulfilled its obligation to present its claims to the Secretary.
The Eldridge court held that the plaintiff beneficiary met the presentment requirement because he "presented" a claim simply by answering a questionnaire as to whether his benefits should be terminated, even when there was no prior decision as to his eligibility. Eldridge , 424 U.S. at 329-30, 96 S.Ct. 893. Likewise, he also presented a claim by subsequently responding to a tentative determination of ineligibility of benefits. Id. at 330, 96 S.Ct. 893.
*680 THD contends that it fulfilled the presentment requirement for the 2017 Suspension because CMS made an overpayment determination and that, for the 2019 Suspension, the requirement was satisfied by THD's rebuttal efforts. [Dkt. 29 at 3].
This Court finds that THD met this nonwaivable requirement when it submitted its Rebuttal Statements pursuant to 42 C.F.R. § 405.372(b)(2). [Pl.'s Ex. B, Dkt. 35]. Like in Eldridge , where the plaintiff beneficiary responded to a tentative determination of ineligibility, here THD responded to a determination of suspension. The Rebuttal Statements present a claim that the payments were wrongfully withheld and required CMS to respond pursuant to 42 C.F.R. § 405.375(a).
b. THD's failure to administratively exhaust cannot be waived.
As noted, the second prong of administrative exhaustion may be deemed waived if (1) the claims are "entirely collateral" to a substantive agency decision; and (2) "full relief cannot be obtained at a post-deprivation hearing" Family Rehab. , 886 F.3d at 501. If the relief sought is "inextricably intertwined" with the substantive claims for benefits then it is not collateral. Heckler v. Ringer , 466 U.S. 602, 614, 104 S.Ct. 2013, 80 L.Ed.2d 622 (1984). For a claim to be collateral, it must not require the court to "immerse itself" in the substance of the underlying Medicare claim or demand a "factual determination" as to the application of the Medicare Act. Affiliated Prof'l. , 164 F.3d at 285-86. Nor can the claim request a relief that would be "administrative," i.e., the substantive, permanent relief that the plaintiff seeks or should seek through the agency appeals process. Id. Instead, "the claim must seek some form of relief that would be unavailable through the administrative process." Eldridge , 424 U.S. at 330-32, 96 S.Ct. 893. The Supreme Court also recognized that the constitutional tenor of a claim is not a determinative factor in deciding whether a claim is collateral-that is, a party's characterization of a claim as "collateral" is not determinative. Heckler , 466 U.S. at 614, 104 S.Ct. 2013.
In Family Rehabilitation , the Fifth Circuit deemed the administrative exhaustion requirement waived because it determined plaintiff's claims were collateral claims. Family Rehab. , 886 F.3d at 503. In that case, CMS made a determination of overpayment and was about to begin the recoupment process. Id. at 500. Plaintiff reached the third step of the administrative appeals process: a hearing with an ALJ. Id. at 500. But instead of receiving a hearing within 90 days, as required by 42 C.F.R.§ 405.1100, plaintiff could not obtain a hearing for three to five years due to ALJ's backlog of cases. Id. Plaintiff asked that the district court for a hearing before CMS began to recoup its Medicare revenues. Id. at 503. The Fifth Circuit considered plaintiff's due-process and ultra vires claims to be collateral because they "only require the court to determine how much process is required under the Constitution and federal law before recoupment" and did "not seek a determination that the recoupments are wrongful under the Medicare Act." Id. at 503. Instead, plaintiff only asked that recoupment be suspended until a hearing was held, "which is quite different from a permanent reinstatement of benefits." Id. at 504.
Here, in contrast, THD did not show that its claims are wholly collateral. Indeed, THD seeks the exact relief courts have identified as non-collateral. THD requests that the Court lift the 2019 Suspension be lifted before it even receives an overpayment determination from CMS. This is the exact substantive, permanent relief that THD can seek through the agency appeals process. As conceded by *681 THD, the 2017 Suspension is no longer before the Court because CMS issued its overpayment determination on July 5, 2019; nor is THD arguing it cannot begin the appeals process for the 2017 Suspension overpayment determination. [Dkt. 20 at 3]. Instead, THD argues CMS violated its due process rights because the 2019 Suspension is allegedly based on claims that were part of the 2017 Suspension. To determine whether such an allegation is true, the Court would need to immerse itself in the substance of the underlying Medicare claim or demand a factual determination as to the application of the Medicare Act-thus making THD's claim not collateral. See Family Rehab. , 886 F.3d at 501.
THD also failed to show that it could not obtain full relief at a post-deprivation hearing. To demonstrate such a deprivation, THD needs to raise a colorable claim that erroneous recoupment will damage it in a way not recompensable through retroactive payments. Family Rehab., 886 F.3d at 504 (citing Eldridge , 424 U.S. at 331, 96 S.Ct. 893 ). "The requirement of a colorable claim is not a stringent one." Abraham v. Exxon Corp. , 85 F.3d 1126, 1129 (5th Cir. 1996) (internal quotations omitted). A plaintiff need show nothing more than "some possible validity." Family Rehab., 886 F.3d at 504 (citing Richardson v. United States , 468 U.S. 317, 326, n.6, 104 S.Ct. 3081, 82 L.Ed.2d 242, (1984) ).
In Family Rehabilitation the Court found that the combined threats of going out of business and disruption to Medicare patients was sufficient for irreparable injury. Family Rehab., 886 F.3d at 504. There, plaintiff provided home healthcare services to patients and Medicare payments constituted 94% of plaintiff's revenue. Family Rehab., 886 F.3d at 499.
In contrast, Medicare payments only make up 30% of THD's revenue. Despite the 2017 Suspension, THD continued with the same business structure of making 30% of its revenue Medicare-dependent-even though it knew its payments were going to be withheld until CMS rendered an overpayment determination. THD made the business decision to continue participating in Medicare, and after more than two years, it cannot require this Court to redress its business decision by threatening imminent bankruptcy. Further, THD voluntarily participates in Medicare. The federal statutes and regulations outlining CMS's suspension and administrative appeals process are publicly available so THD knew or should have known about the administrative procedures before deciding to participate.
Additionally, unlike in Family Rehabilitation . , THD's health services will cause less disruption to Medicare patients. THD is a diagnostics laboratory, usually performing tests in an early stage of a disease progression. If THD were to file for bankruptcy or to liquidate, there is a low risk of patient disruption because patients using THD's services seek diagnostic testing and not an immediate health service. Moreover, these patients do not know where their medical samples are being tested because it is the physicians who are choosing which diagnostics laboratory to use. Further, as presented at the preliminary injunction hearing, there are over 3,500 diagnostic laboratories nationwide that provide similar services as THD. Even if THD were to close, the physicians have plenty of options to choose from and patient samples can be tested at numerous other labs.
This Court cannot deem the exhaustion requirement waived since both requirements (1) entirely collateral claims, and (2) full relief cannot be obtained at a post-deprivation hearing, have not been met.
*682 Family Rehab. , 886 F.3d at 501. In consequence, this Court lacks subject-matter jurisdiction under 42 U.S.C. § 405(g).
2. No mandamus jurisdiction exists.
"The district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." 28 U.S.C. § 1361. Section 1361 only provides jurisdiction to order a completion of affirmative actions. Randall D. Wolcott, M.D., P.A. v. Sebelius , 635 F.3d 757, 766 (5th Cir. 2011). "[M]andamus jurisdiction exists if the action is an attempt to compel an officer or employee of the United States or its agencies to perform an allegedly nondiscretionary duty owed to the plaintiff." Id. It does not provide jurisdiction over requests "for other types of relief-such as injunctive relief." Id. Injunctive relief is the remedy to, (1) restrain the doing of injurious acts, or (2) to require undoing of injurious acts and restoration of the status quo. Id.
The Fifth Circuit in Family Rehabilitation held that there was no mandamus jurisdiction in the Medicare case in which since plaintiff only seeks injunctive relief. Family Rehab. , 886 F.3d at 506. But the Fifth Circuit reserved the issue of whether asking for the timely hearing afforded mandamus jurisdiction or not. Id at 507.
THD requests mandamus relief for the following:
"(i) terminate their unlawful suspensions of Medicare payments to True Health until such time as an overpayment decision is issued and due process provided; (ii) immediately release the suspended funds being held in escrow by Defendants; and (iii) implement a full, speedy, and adequate administrative review process if Defendants intend to recoup or withhold any of True Health's Medicare payments in the future."
[Dkt. 2 at 20].
As to (i) and (ii), THD seeks an order to compel CMS to remedy the allegedly injurious act of suspending and withholding its Medicare payments. Like in Family Rehabilitation , that constitutes an injunctive relief, and thus no mandamus jurisdiction exists for those claims.
As to (iii), THD seeks an affirmative action from CMS, but CMS does not owe a nondiscretionary duty to plaintiff. Taking THD's facts as true, it is not entitled to an overpayment determination in a specific amount of time not provided by federal regulation or statute. Nor does CMS have a duty to start the appeals process within a timeframe not set by federal law. Congress, through the Medicare Act and federal regulations, designed am administrative process, and THD fails to point out any specific section requiring CMS to "implement a full, speedy, and adequate administrative review process" if it intends to recoup or withhold payments in the future.
3. The All Writs Act ( 28 U.S.C. § 1651(a) ) does not provide subject-matter jurisdiction.
THD conceded at the preliminary injunction hearing that "the All Writs Act essentially collapses into the mandamus analysis." Because this Court determines that it has no mandamus jurisdiction, it need not address 28 U.S.C. § 1651(a) as its own basis for jurisdiction. Further, the All Writs Act is not itself a grant of jurisdiction. See In re Tennant , 359 F.3d 523, 527 (D.C. Cir. 2004).
4. Bivens does not provide subject-matter jurisdiction.
Although the Supreme Court has not discussed the availability of a Bivens *683 remedy in the context of the Medicare Act, it has refused to extend Bivens in the Social Security context. Schweiker v. Chilicky , 487 U.S. 412, 420, 108 S.Ct. 2460, 101 L.Ed.2d 370 (1988). As the Fifth Circuit has stated when addressing this issue, courts "will not imply a Bivens remedy for an alleged constitutional violation in the denial of Medicare Act reimbursements, because Congress has created a comprehensive statutory administrative review mechanism, which was intended fully to address the problems created by wrongful denial of Medicare reimbursements." Marsaw v. Thompson , 133 F. App'x 946, 948 (5th Cir. 2005). Beyond mentioning Bivens once in its Complaint, THD does not explain why the Court has jurisdiction under Bivens. THD has failed to meet its burden of establishing subject-matter jurisdiction under Bivens.
5. The Court's inherent equity power and power to preserve its own jurisdiction does not provide subject-matter jurisdiction.
Although THD asserts the court's inherent equity power and power to preserve its own jurisdiction as bases for subject-matter jurisdiction, it fails to provide one legal authority explaining how either concept grants subject-matter jurisdiction when none exists elsewhere. The Court knows of no such legal authority and does not find subject-matter jurisdiction based on its inherent equity power or power to preserve its own jurisdiction.
B. Even if the Court had subject-matter jurisdiction, THD is still not entitled to a preliminary injunction because it failed to establish all four elements.
Even assuming the Court had subject-matter jurisdiction, THD is still not entitled to a preliminary injunction because it did not clearly carry its burden of persuasion on all four requirements for a preliminary injunction.
1. THD failed to establish a substantial likelihood of success on any of its claims.
A district court "look[s] to standards provided by the substantive law to determine likelihood of success on the merits." Janvey v. Alguire , 647 F.3d 585, 597 (5th Cir. 2011). Although THD only discusses its due process claims in its Preliminary Injunction Motion, the Court will discuss the likelihood of success on all the claims raised in its Complaint for the sake of completeness.
a. THD failed to establish a substantial likelihood of success on its procedural due process claim.
Courts weigh three factors when determining whether the procedural due process provided is adequate: (1) the private interest that will be affected by the official action; (2) the risk of an erroneous deprivation of such interest through the procedure used, and the probable value, if any, of additional or substitute procedural safeguards; and (3) the Government's interest, including the function involved and the fiscal administrative burdens that the additional or substitute procedural requirement would entail. Mathews v. Eldridge , 424 U.S. 319, 332, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976).
THD alleges CMS violated its procedural due process rights by: (1) suspending THD's Medicare reimbursements "indefinitely without providing any pre- or post-deprivation process to challenge the actual basis of the suspension" [Dkt. 2, ¶ 70]; (2) "repeatedly extend[ing] this suspension for a period now approaching 2 years, without providing True Health without [sic] any pre- or post-deprivation process to challenge *684 the actual basis of the suspension" [Dkt. 2, ¶ 71]; (3) imposing "a second suspension based on the same claims that were involved in the ongoing original suspension," which allegedly allows CMS "to effectively override existing regulatory time limits and due process requirements by causing a regulatory reset of the suspension process over two years after the initial suspension was imposed" [Dkt. 2, ¶ 72]; (4) failing or refusing "to make an overpayment determination ... in order to intentionally deprive True Health of procedural right to which it is entitled" [Dkt. 2, ¶ 73]; and (5) making overpayment determinations concerning the 2017 Suspension in September 2017 and January 2018 but failed to inform THD until July 2019 [Dkt. 20 at 5-6]. THD concedes that because CMS made an overpayment determination as to the 2017 Suspensions, only the 2019 Suspension remains [Dkt. 20 at 3], which renders several of the alleged procedural due process violations moot.
As a general matter, all three factors weigh against THD. As to the first factor, THD does not have a property interest in Medicare reimbursement. Pers. Care Prod., Inc. v. Hawkins , 635 F.3d 155, 159 (5th Cir. 2011) ("Federal law does not prohibit these payment holds ... [t]he statutory scheme does not give [the Medicare provider] a property interest in its present reimbursement claims while past claims are under investigation for fraud."); Shah v. Azar , 920 F.3d 987, 998 (5th Cir. 2019) ("We agree with our four other sister circuits that have determined participation in the federal Medicare reimbursement program is not a property interest."). Without a property interest, this is no risk of an erroneous deprivation. Further, the Government's interest here in protecting the integrity of Medicare against fraud and its interest in the administrative process outweigh THD's nonexistent property interest.
A comparison between THD's specific allegations and federal regulations further reveals that THD does not have a substantial likelihood of success for its procedural due process claim. THD's first allegation-that CMS violated its procedural due process right by suspending its Medicare reimbursements "indefinitely without providing any pre- or post-deprivation process to challenge the actual basis of the suspension"-is meritless for several reasons. First, CMS can suspend payment without notice if the suspension is based on credible allegations of fraud. 42 C.F.R. § 405.372(a)(4) ("If the intended suspension of payment involves credible allegations of fraud under § 405.371(a)(2), CMS in consultation with OIG and, as appropriate, the Department of Justice determines ... if prior notice is appropriate."). Second, as THD concedes, there are post-deprivation procedurals in place to challenge the suspension, including the rebuttal statement and appeals process. 42 C.F.R. § 405.372(b) ("[T]he Medicare contractor must, once the suspension is in effect, give the provider or supplier an opportunity to submit a rebuttal statement as to why the suspension should be removed."); 42 C.F.R. § 405.904(a)(2). Indeed, THD has already participated in the post-deprivation procedure by submitting rebuttal statements for the 2017 and 2019 Suspensions. See [Dkt. 3-11, 3-12]. And now, with the CMS determination on the 2017 Suspension, THD can begin the four-step administrative appeals process. Third, contrary to THD's allegation CMS has not suspended its Medicare reimbursements indefinitely, nor could it because federal regulations prohibit indefinite suspension. As mentioned, CMS must reevaluate every 180 days whether good cause exist to not continue the suspension. 42 C.F.R. § 405.371(b)(2)(i). In addition, CMS must end the suspension after 18 months unless *685 the case has been referred to, and is being considered by, the OIG for administrative action or the Department of Justice requests that the suspension continue. 42 C.F.R. § 405.371(b)(3)(ii). Here, CMS terminated the 2017 Suspension on July 5, 2019, and the 2019 Suspension has been in place for just over a month-this is hardly an indefinite suspension and well within the 180 days or 18 months limit.
THD's second allegation, that CMS has repeatedly extended the 2017 Suspension without providing THD any pre- or post-deprivation process to challenge the basis of the suspension, is moot due to CMS's July 5th overpayment determination concerning the 2017 Suspension. Even if it were not moot, as discussed above, CMS can extend the suspension, does not need to provide prior notice, and THD can challenge the suspension post-deprivation.
THD's third allegation-that CMS imposed the 2019 Suspension based on the same claims that were part of the 2017 Suspension, which effectively allows them to exceed existing regulatory time limits-likewise lacks a substantial likelihood of success. THD argues its Exhibit L, a document containing excerpts of the claims CMS investigated as part of its 2017 Suspension, shows that some of the claims CMS investigate as part of its 2017 Suspension also served as the basis for its 2019 Suspension. First, determining whether the 2017 Suspension was based on the same claims as the 2019 Suspension forces the Court to "examine the merits of the underlying dispute, delve into the statute and regulations, or make independent judgments as to plaintiffs' eligibility under a statute," which the Court cannot do. Family Rehab., Inc. v. Azar , 886 F.3d 496 (2018). Second, even if the Court could engage in this substantive analysis, THD failed to show (a) the 2019 Suspension was based on the same claims as the 2017 Suspension; and (b) that implementing two suspensions on overlapping claims is prohibited. The June 2019 Letter specifically noted that the five claims listed were "not exhaustive or complete in any sense." So even if those five claims were investigated as part of the 2017 Suspension, the 2019 Suspension could include other claims that were not subject to the 2017 Suspension. If there are prohibited overlapping claims in the 2019 Suspension that were part of the 2017 Suspension, CMS needs time to investigate that. As to THD's extension of regulatory time limits, CMS implemented the 2019 Suspension approximately a month ago and terminated the 2017 Suspension on July 5, 2019. CMS's actions are well-within the regulatory time limits.
THD's fourth allegation concerning CMS's refusal to make an overpayment determination is moot as to 2017 Suspension and premature as to the 2019 Suspension.
Finally, THD's contention that CMS violated procedural due process by allegedly making an overpayment determination about the 2017 Suspension in September 2017 and January 2018, but failing to inform THD until July 2019, also does not have a substantial likelihood of success. Assuming CMS did make a final determination in September 2017 or January 2018, THD cites no federal regulation or law that mandates when CMS must disclose that determination within a set time limit-much less that it exceeded the time limit.
None of THD's procedural due process allegations show a substantial likelihood of success. THD does not point to a single statutory provision CMS has violated. Instead, THD generally complains about the speed of the administrative process. But there is no constitutional provision, statute, *686 or federal law of any kind, that mandates a government agency to move at the speed a party demands-particularly when the agency complies with the regulatory time limits.
b. THD does not show a substantial likelihood of success for its substantive due process Claim.
All of THD's substantive due process claims sound in procedural due process, which lacks a substantial likelihood of success. See [Dkt. 2, ¶¶ 78-92]. Regardless, as discussed, THD does not have a property interest in Medicare payments so it did not show a substantial likelihood of success for its substantive due process claims.[4]
c. THD fails to show a substantial likelihood of success for its Administrative Procedure Act claim.
Assuming the Court has jurisdiction because the Administrative Procedure Act ("APA") is not an independent basis for jurisdiction (see Califano v. Sanders , 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977) ), THD did not show a substantial likelihood of success for its APA claim. The APA permits judicial review of agency actions to determine if the agency acted in an arbitrary or capricious manner. 5 U.S.C. § 706. Here, THD argues that CMS "acted in a manner that is contrary to constitutional right by suspending True Health's Medicare payments in violation of the due process clauses of the Fifth and Fourteenth Amendments" [Dkt. 2, ¶ 96], but not that CMS's actions are arbitrary and capricious. Further, because THD did not demonstrate a likelihood of success on either its procedural or substantive due process claims, it likewise does not establish a likelihood of success on its APA claim that is rooted in the due process claims.
d. THD fails to demonstrate a likelihood of success as to its mandamus claim.
Assuming the court has mandamus jurisdiction, THD did not show a likelihood of success for its mandamus claim. To obtain mandamus relief, THD must show (1) a lack of other adequate remedies; (2) that it has "a clear right to the relief": and (d) CMS has "a clear duty to act." Jones v. Alexander , 609 F.2d 778, 781 (5th Cir. 1980). THD alleges it is entitled to a writ of mandamus that requires CMS to (1) terminate its Medicare payment suspensions "until such time as an overpayment decision is issued and due process provide"; (2) immediately release the suspended funds; and (3) implement a full, speedy, and adequate administrative review process if CMS intends to recoup THD's payments in the future." [Dkt. 2, ¶ 107]. Here, THD does not lack other adequate remedies. It is proceeding through the administrative process with both its 2017 Suspension and its 2019 Suspension. THD fails to show a "clear right to relief," and there lacks "a clear duty" for CMS to act in the manner THD demands. As such, THD did not demonstrate a likelihood of success for its mandamus claim.
e. THD fails to establish a substantial likelihood of success for its Declaratory Judgment claim.
THD alleges it is entitled to declaratory judgment because CMS has *687 "acted beyond the scope of applicable laws and regulations in imposing a second Medicare payment suspension on True Health while the original suspension remains in place where the second suspension is based on the very same claims that were reviewed as part of the ongoing, original suspension." [Dkt. 2, ¶ 58]. Putting aside the issue that the Court cannot wade into substantive determinations regarding the claims, the Declaratory Judgment Act, 28 U.S.C. § 2201, does not create any substantive rights or causes of action. Harris Cty Texas v. MERSCORP, Inc. , 791 F.3d 545, 552 (5th Cir. 2015). Assuming the Court has jurisdiction, THD failed to show a substantial likelihood of success for all of the separate causes of actions THD asserts as a basis for declaratory judgment. See Skelly Oil Co. v. Phillips Petroleum Co. , 339 U.S. 667, 671, 70 S.Ct. 876, 94 L.Ed. 1194 (1950) (finding that the Declaratory Judgment Act is not an independent basis for federal jurisdiction). Without more, THD does not establish a substantial likelihood of success for its declaratory judgment claim.
2. THD did not establish that it will suffer irreparable harm if the preliminary injunction is not granted.
To establish a threat of irreparable harm, THD must show "a significant threat of injury from the pending action, that the injury is imminent, and that money damages would not fully repair the harm." Humana, Inc. v. Jacobson , 804 F.2d 1390, 1394 (5th Cir. 1986). Loss of income is not an irreparable injury. Sampson v. Murray , 415 U.S. 61, 92, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974). "Severe economic impracticability" is also not enough for a party to avoid channeling its claims through the relevant agency. Physician Hosps. of Am. v. Sebelius , 691 F.3d 649, 655 (5th Cir. 2012). In the Medicare context, "the combined threats of going out of business and disruption to Medicare patients are sufficient for irreparable injury." Family Rehab. v. Azar , 886 F.3d 496, 504 (5th Cir. 2018).
THD argues it faces irreparable harm because, without injunctive relief, it will seek "bankruptcy protection or liquidation outside of bankruptcy immediately" and its closure "may deprive patients of these crucial diagnostic services, causing patient health to suffer." [Dkt. 3-2, ¶¶ 9, 10]. Yet little evidence supports either harm.
First, THD failed to establish it is likely to close due to any Medicare payment suspension. As previously mentioned, unlike the plaintiff in Family Rehabilitation , which derived "between 88 and 94 percent" of its revenue from Medicare-reimbursable services, THD receives only 30% of its revenue from Medicare. See Family Rehab. , 886 F.3d at 499. In addition, Medicare only accounts for 20% of THD's expenses. [Dkt. 3-2, ¶ 4]. Based on the financial information presented and Mr. Richards's testimony, THD stands to make a profit from the Medicare services of its business-even with a 35% payment suspension. For example, THD's total revenue in 2016 was $160.9 million, and its total expenses was $117.8 million. [Defs.'s Ex. 3 at 2, Dkt. 36]. Of those amounts, approximately $48.27 million in revenue (30%) was attributable to CMS and approximately $23.56 million in expenses (20%) was attributable to Medicare costs, resulting in a profit $24.71 million from Medicare services.[5] Although THD did not present specific financial information concerning 2018, Mr. Richards testified that *688 the Medicare portion of THD's business in 2018 decreased by approximately 25% in revenue and $2.4 million in expenses due to CMS's actions (as opposed to market changes). Using the 2016 financial information as a basis, Mr. Richards agreed that THD received approximately $23.53 million[6] in revenue from CMS and spent approximately $21.2 million[7] in Medicare expenses in 2018-resulting in a profit of just over two million dollars. THD failed to show how a suspension of Medicare payments, even at 100%, would cause irreparable harm-particularly because THD derives 70% of its revenue from private payers.
Essentially, THD is asking for a government bailout. THD cannot secure funding from private investors to allegedly keep the company solvent and instead demands the federal government save it from the verge of alleged bankruptcy. Even if THD is on the brink of bankruptcy, the government has no obligation to save a private company that cannot convince its private investors to invest. THD voluntarily entered into the Medicare program. And it voluntarily structured its business so that approximately 30% of its revenue is Medicare dependent-even after CMS implemented the 2017 Suspension. This Court will not compel taxpayers to bail out a company because it failed to properly manage its finances.
Second, even if THD established imminent bankruptcy, it failed to show patient disruption. Again, unlike the Family Rehabilitation plaintiff that provided home healthcare services to patients, THD provides diagnostic lab testing services to physicians and does not provide patient-based services. It is undisputed that over 3,500 certified laboratory companies provide similar services and do business with Medicare. And although THD contests that its lab model is different from other lab companies, THD conceded at the Hearing that its customers (the physicians) can send the lab samples "wherever they want to send" for testing. Thus, should THD close, no patients are uprooted from a hospital or denied services; nor are any patient services, home healthcare or otherwise, disrupted. Instead, should THD close, physicians would merely send their lab samples elsewhere for testing.
3. THD's threatened injury does not outweigh the damage that the preliminary injunction might cause CMS.
The balance of hardships tips in CMS's favor. In contrast to THD's economic risk and low risk of patient disruption, if any, CMS's interest in preserving the integrity of the Medicare program is high. Undisputedly, the federal government has a strong interest in protecting the Medicare program against financial loss and fraud.
4. The preliminary injunction will disserve the public interest.
The public interest is served by requiring compliance with Congressional statutes. Sparrow Barns & Events v. Ruth Farm, Inc. , No. 4:19-cv-67, 2019 WL 1560442, at *10 (E.D. Tex. Apr. 10, 2019). Congress designed an intricate process that serves the public by allowing CMS an opportunity to investigate allegations of fraud, providing the aggrieved party multiple levels of review, and having the courts act as a check on agency action through *689 judicial review. To allow THD to circumvent the administrative process and have unfettered access to Medicare funds-paid by the public-while CMS investigates credible allegations of fraud would surely disserve the public.
IV. CONCLUSION
Although the Court is cognizant of parties who are denied their procedural due right process because CMS fails to follow statutory regulations (e.g., failing to provide an ALJ hearing within 90 days), that is not the case here. Medicare is a voluntary program. THD chose to provide Medicare services, chose to make 30% of its revenue Medicare dependent, and chose to continue providing Medicare services after CMS imposed a suspension in 2017. THD cannot circumvent the administrative process because it wants to be paid according to the schedule it demands. This Court lacks subject-matter jurisdiction to grant the preliminary injunctions, but even if it had jurisdiction, THD failed to meet its burden of establishing all four requirements for a preliminary injunction.
IT IS THEREFORE ORDERED that Plaintiff True Health Diagnostics, LLC's Motion for a Preliminary Injunction [Dkt. 20] is DENIED.

CMS contends the 2017 Suspension is the subject of a qui tam case pending in the Easter District of Texas's Sherman Division (Case No. 4:16-cv-547). THD contends the qui tam case is unrelated to this case. Because there is no motion to transfer before the Court, and because such a determination is unnecessary at this time, the Court makes no determination as to whether the qui tam case is related to this case.

These exhibits are attached to THD's Reply in Support of its Motion for a Preliminary Injunction. [Dkt. 29]. During a conference on July 16, 2019, the CMS orally moved to strike THD's Reply because it was filed after the July 11, 2019 deadline for Plaintiff to file "additional supporting papers for the preliminary injunction, if any." See [Dkt. 16]. THD timely filed its Motion for a Preliminary Injunction on July 11, 2019, but did not file its Reply until July 16, 2019. Because THD may file a reply pursuant to Local Rule CV-7(f) and could not have filed it earlier than July 16, 2019 as CMS filed its Response on July 15, 2019, the Court denies CMS's oral motion to strike THD's Reply in Support of its Motion for a Preliminary Injunction [Dkt. 29].

Both § 405(g) and (h) have been made applicable to Medicare. See 42 U.S.C. § 1395ff(b)(1)(A) (making section 405(g) applicable to Medicare). Cf. Shalala v. Ill. Council on Long Term Care, Inc. , 529 U.S. 1, 12-13, 120 S.Ct. 1084, 146 L.Ed.2d 1 (2000) ; Physician Hosps., 691 F.3d at 653 (holding that 42 U.S.C. § 1395ii "makes Section 405(h) applicable to Medicare").

The Court recognizes that a property interest may exist in Medicare payments for properly billed claims subject to recoupment by the government, since withholding payments for properly billed claims is not the same as returning money to which it was never entitled. See Med-Cert Home Care, LLC v. Azar , 365 F. Supp. 3d 742, 751, n.3 (N.D. Tex. 2019).

Even if the 35% suspension had been implemented in 2016, which it was not, THD would still receive approximately $31.38 million (65% of $48.27 million) in revenue and net a profit of over $7.81 million from the Medicare services part of its business.

$48.27 million x 0.75 (the 25% decrease attributable to the government's actions) x 0.65 (the 35% suspension).

$23.56 million (2016 in Medicare expenses) minus $2.4 million (2018 decrease in Medicare expenses).